2009 UT App 382

STATE of Utah, Plaintiff and Appellee,

v.

Jamis M. JOHNSON, Defendant and Appellant.

No. 20070909–CA.

Court of Appeals of Utah.

Dec. 17, 2009.

Rodney G. Snow, Walter A. Romney Jr., and Aaron D. Lebenta, Salt Lake City, for Appellant.

Mark L. Shurtleff, Atty. Gen. and Karen A. Klucznik, Asst. Atty. Gen., Salt Lake City, for Appellee.

Before Judges THORNE, ORME, and McHUGH.

## OPINION

McHUGH, Judge:

¶ 1 Jamis M. Johnson appeals his criminal conviction for securities fraud, a violation of the Utah Uniform Securities Act (the Securities Act), *see* Utah Code Ann. §§ 61–1–1 to –30 (2006 & Supp.2009),[1] and the accompanying restitution order entered by the trial court. We affirm in part and reverse and remand in part.

## BACKGROUND [2]

### The Transaction

■ ¶ 2 In the summer of 2000, two dairymen held a family dairy farm as the sole members of a limited liability company (the LLC). In July 2000, the dairymen learned that A. Paul Schwenke "was interested in meeting some dairy farmers to talk about some investment." During July and August 2000, the dairymen had a series of meetings with Schwenke, Johnson, and several other individuals to discuss the proposed investment. Before attending the first meeting, Johnson did not know the details of Schwenke's plan.[3] Schwenke introduced Johnson as "a high powered lawyer" and a "security expert from out of New York," which one of the dairymen said "lent a great deal of credibility" to Schwenke's presentation. Neither Schwenke nor Johnson disclosed that Johnson was the subject of ongoing disciplinary proceedings by the Utah State Bar for misappropriating client funds.[4] Johnson was also subject to three tax liens, totaling $1,669,562.89, against his property,

---

1. Unless otherwise noted, we cite to the current Utah Code as a convenience to the reader because the relevant sections are substantively unchanged from the version in effect at the time of Johnson's crime.

2. In reviewing an appeal from a jury verdict, "we view the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict. We recite the facts accordingly." *State v. Shepherd*, 1999 UT App 305, ¶ 2, 989 P.2d 503 (internal quotation marks omitted).

3. Johnson was invited to attend the meeting to settle a debt related to Johnson's losses in a previous business deal with Schwenke.

4. On September 14, 1999, the district court entered an order and judgment of disbarment against Johnson for misappropriating client funds. At the time of the meetings with the dairymen, that judgment was stayed, pending appeal. The Utah Supreme Court affirmed the judgment of disbarment in December 2001, *see In re Johnson*, 2001 UT 110, 48 P.3d 881, more than a year after the transaction at issue in this case.

and had a Small Business Administration judgment against him. Johnson did not disclose these facts at the meeting. Nor did Johnson tell the dairymen that Schwenke was an attorney who had been disbarred for misappropriating client funds and that Johnson was pursuing legal action against Schwenke over a failed business deal.

¶ 3 At the meetings, Schwenke proposed that the dairymen invest in American–Dairy.com, Inc. (American–Dairy), a company that Schwenke had recently incorporated. Schwenke said his plan was to obtain 10,000 to 15,000 cows, "go online" with the company, and "show investors their cows over the internet." Schwenke also indicated that he would obtain financing by selling stock in an initial public offering. Johnson explained how stocks would work in the public company. Schwenke and Johnson told the dairymen that there were some risks associated with any stock transaction, but they did not elaborate. The dairymen described the farm, including the number of cows, the need to expand to become profitable, and the need to refinance a "substantial loan" against the dairy to complete the transaction.

¶ 4 At a second meeting on August 2, 2000, Johnson reviewed a draft of a stock purchase/trade agreement with the dairymen.[5] At the request of one of the dairymen, Johnson again explained how the public offering would work, stating that the share prices in an initial public offering would start at a minimum of $4 per share and might be as high as $8 per share.

¶ 5 Following the August 2 meeting, the dairymen's personal attorney reviewed the draft agreement and added a provision voiding the transaction if American–Dairy had not registered its stock for a public offering within two years. On August 9, 2000, the dairymen returned to Schwenke's office and signed the revised agreement (the Agreement), thereby transferring all the farm's assets, including the real estate, equipment, and livestock associated with the farm, to American–Dairy in exchange for stock in the company.

¶ 6 Johnson signed the Agreement on behalf of American–Dairy as the company's CEO and signed stock certificates issuing 200,000 shares to the dairymen. Although the Agreement recites that American–Dairy had issued "10,000,000 shares of .001 cents par value common stock," no other shares were issued, making the dairymen the sole shareholders. The dairymen also signed proxy agreements naming Schwenke as their "attorney and agent," which empowered Schwenke to vote their shares at all shareholder meetings "for the transaction of any business."

¶ 7 Following the execution of the Agreement and the transfer of assets, Johnson had no additional direct contact with the dairymen. The parties never discussed whether Johnson would remain as American–Dairy's CEO, although the record reflects that Johnson continued to have some involvement in that capacity, as evidenced by his signature on American–Dairy's bankruptcy petition and his preparation of a temporary restraining order on behalf of the company.

¶ 8 For the most part, the dairymen continued to manage the day-to-day operations of the farm. However, because the warranty deed had been transferred to American–Dairy, they could not obtain any bank financing. The dairymen also testified that Schwenke moved an additional 200 to 250 cows onto the farm, refused to allow the dairymen to lease out an unused portion of the farm, and obtained a $50,000 loan against the farm on which he never made any payments.[6] Eventually, creditors foreclosed on the farm and its equipment. As part of the foreclosure proceedings, one of the dairymen also forfeited a $70,000 certificate of deposit,

---

5. Johnson did not draft the agreement, and he claims that Schwenke presented it to the dairymen. However, one of the dairymen testified that it was Johnson who presented the agreement.

6. Johnson's brief states that as sole shareholders, the dairymen had the authority to fire or hire any officers or directors of American–Dairy if they were unhappy with how the company was managed. Although the dairymen might have removed Johnson under normal circumstances, the proxy agreement gave Schwenke the right to vote their shares. Moreover, Schwenke could not be removed because he did not have a formal position with American–Dairy.

which had previously been used as collateral for a loan to purchase cattle.

*The Trial*

¶ 9 On October 24, 2005, Johnson and Schwenke were charged as co-defendants with one count each of securities fraud, a second degree felony, *see* Utah Code Ann. § 61–1–1 (2006); *id.* § 61–1–21(2)(b) (Supp. 2009), and theft by deception, a second degree felony, *see* Utah Code Ann. §§ 76–6–405, –412 (2008). The trial court later severed Johnson's and Schwenke's cases, and granted the State's motion to dismiss the theft by deception charge against Johnson. After several defense attorneys withdrew, Johnson represented himself at trial.[7]

¶ 10 The State called Michael Hines, the Director of Enforcement for the Utah Division of Securities, to testify as an expert witness. After the trial court qualified Hines as an expert, *see generally* Utah R. Evid. 702 ("[A] witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion . . . ."), the State questioned Hines about various topics related to securities transactions. Hines testified that the purposes of securities laws are to prevent fraud and to protect investors. Hines also testified that, unlike other sales, the securities market is a "seller beware" market, meaning "the seller has to make sure . . . [he or she] disclose[s] all material facts to an investor." Hines defined the kind of material facts that must be disclosed under section 61–1–1 of the Securities Act as those that "a reasonable prudent investor . . . would want to know," adding that officers of a corporation have a specific duty to disclose material facts about their backgrounds. Hines further testified to the hypothetical types of statements and omissions that would violate section 61–1–1, and to the meaning of a direct or indirect connection to the sale of a security under the Securities Act.

¶ 11 Johnson repeatedly objected to Hines's testimony on the grounds that Hines

was misstating the law and impermissibly stating legal conclusions as to what the law is. In response, the trial court allowed Johnson to cross-examine Hines regarding the alleged misstatements, and orally instructed the jury that

> the court is going to indicate to the jury that at some point in this trial the court is going to give you instructions with respect to . . . issues of law that will govern your deliberations. And . . . at that time . . . , the court will instruct you as to what the law is.

¶ 12 Johnson conducted a thorough cross-examination of Hines, questioning him about the meaning of section 61–1–1, how the statute would be applied in different hypothetical situations, including what additional disclosures a person like Johnson would be required to make before completing a transaction similar to the one at issue. To rebut Hines's testimony, Johnson called Nathan Dredge, a securities attorney and former securities analyst, as an expert witness. Dredge also testified to the purpose of state securities laws, the definition of a security, what constituted material facts, and whether Johnson had an affirmative duty to disclose certain facts in this case. Dredge's interpretation of those issues differed from the interpretation in Hines's testimony. In addition to Dredge's testimony, Johnson testified on his own behalf and called Schwenke as a defense witness.

*Post–Trial Proceedings and Motions*

¶ 13 On March 7, 2007, after deliberating for six hours, the jury found Johnson guilty of securities fraud. On June 6, 2007, the trial court sentenced Johnson to a suspended prison term of one to fifteen years, thirty-six months of supervised probation, six months in the Millard County Jail, and an additional six months of electronically monitored home confinement. The trial court further imposed a $5000 fine and "set [c]ourt ordered restitution . . . at $125,000, the same as [the court] ordered for . . . Schwenke," to be paid

---

7. Appellate counsel, Rodney G. Snow, Walter A. Romney Jr., and Aaron D. Lebenta of Clyde Snow Sessions & Swenson were not involved in the trial proceedings until Johnson's sentencing and they have generously donated their professional services by handling this appeal on a pro bono basis. We commend them for their efforts.

jointly and severally by Johnson and Schwenke.

¶ 14 On June 15, 2007, Johnson filed a timely objection to the restitution order and requested a hearing on the issue. Johnson filed a timely motion for a new trial on June 20, 2007. The trial court entered final judgment on July 2, 2007, and denied Johnson's motion for new trial on October 10, 2007. The trial court held a restitution hearing on October 10 and 24, 2007, and entered its final restitution order on December 5, 2007, ordering $120,000 in restitution, to be paid jointly and severally by Johnson and Schwenke.

¶ 15 On November 8, 2007, after the restitution hearing but before entry of the final restitution order, Johnson filed a timely notice of appeal (Original Appeal) in the trial court. Johnson filed a renewed motion for new trial on November 14, 2007, alleging that new evidence obtained at the restitution hearing demonstrated that the farm property was not worth $10,000, as required to obtain a second degree felony securities fraud conviction under section 61–1–21(2)(b)(i). *See* Utah Code Ann. § 61–1–21(2)(b)(i) (Supp. 2009) ("A person who willfully violates Section 61–1–1 ... is guilty of a second degree felony if: ... at the time the crime was committed, the property ... unlawfully obtained ... was worth $10,000 or more...."). The trial court denied Johnson's renewed motion for new trial on August 12, 2008, and Johnson filed an amended notice of appeal (Second Appeal) with this court, but not the trial court, on August 19, 2008. Johnson now appeals from his conviction, the restitution order, and the denials of his motions for new trial.

## ISSUES AND STANDARDS OF REVIEW

■ ¶ 16 On appeal, Johnson contends that section 61–1–1 does not apply to his case because the transfer of the LLC assets to American–Dairy merely "constituted a change in the form of ownership" and, therefore, the "transaction did not involve an 'offer' or 'sale' of a security for value." Similarly, Johnson argues that the transfer was not "for value" because the property that the dairymen transferred was "so encumbered as to be valueless." Whether the change in ownership constitutes a sale for value under the statute is a question of statutory interpretation. "The correct interpretation of a statute is a question of law and is reviewed for correctness." *State v. Wallace*, 2005 UT App 434, ¶ 7, 124 P.3d 259 (internal quotation marks omitted), *aff'd*, 2006 UT 86, 150 P.3d 540. The question of whether the property in fact had any value is a factual question that was submitted to the jury, and we will not overturn the jury's finding unless "the evidence and its inferences are so inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt.... Thus, so long as some evidence and reasonable inferences support the jury's findings, we will not disturb them." *Id.* ¶ 16 (citation and internal quotation marks omitted).

■ ¶ 17 Johnson next claims that Hines impermissibly gave legal conclusions and incorrectly testified as to the law related to securities, which prejudiced Johnson. "It is within the discretion of the trial court to determine the suitability of expert testimony in a particular case, and we will not reverse that determination on appeal in the absence of a clear showing of abuse." *State v. Larsen*, 828 P.2d 487, 492 (Utah Ct.App.1992) (citation and internal quotation marks omitted), *aff'd*, 865 P.2d 1355 (Utah 1993).

■ ¶ 18 Johnson further alleges that the Securities Act, as applied to his case, resulted in such a vague definition of the crime that it violated his rights under the Due Process Clause of the Utah Constitution, *see* Utah Const. art. I, § 7. Johnson also maintains that Hines's testimony violated the Utah Constitution's Separation of Powers Clause, *see id.* art. V, § 1. "When reviewing the constitutionality of a statute, we ... presume that the statute is constitutional. The challenger bears the burden of demonstrating the unconstitutionality of a statute. Furthermore, unconstitutionality of a statute must be shown beyond a reasonable doubt. Appellate courts review constitutional challenges for correctness." *State v. Shepherd*, 1999 UT App 305, ¶ 8, 989 P.2d 503 (citations and internal quotation marks omitted). However, "courts should avoid reaching con-

stitutional issues if the case can be decided on other grounds." *West v. Thomson Newspapers*, 872 P.2d 999, 1004 (Utah 1994).

■ ¶ 19 Finally, Johnson challenges the trial court's restitution award. This court

> will not disturb a trial court's order of restitution unless the trial court exceeds the authority prescribed by law or abuses its discretion. Furthermore, [w]hether a restitution [award] is proper ... depends solely upon interpretation of the governing statute, and the trial court's interpretation of a statute presents a question of law, which we review for correctness.

*State v. Miller*, 2007 UT App 332, ¶ 6, 170 P.3d 1141 (alterations and omission in original) (citation and internal quotation marks omitted).

## ANALYSIS

### I. The Timeliness of Johnson's Second Notice of Appeal

¶ 20 As a threshold matter, the State argues that this court lacks jurisdiction to hear the issues raised by Johnson in his Second Appeal, which pertain to the trial court's final restitution order and its denial of Johnson's Renewed Motion for New Trial.[8] *See generally* Utah R.App. P. 4(a) ("[N]otice of appeal ... shall be filed with the clerk of the trial court within 30 days after the date of entry of the judgment or order appealed from."); *State v. Houskeeper*, 2002 UT 118, ¶ 23, 62 P.3d 444 ("[A defendant's] failure to timely file [an appeal] deprives an appellate court of jurisdiction over the appeal."). Johnson responds that his Second Appeal was timely because it was filed with this court less than thirty days after the trial court entered its order denying Johnson's Renewed Motion for New Trial and that, in any event, the Original Appeal gives this court jurisdiction to hear the issues Johnson raises with respect to the trial court's restitution order.

### A. Johnson's Second Appeal Was Not Necessary.

■ ¶ 21 In support of its argument that the Second Appeal was ineffective to confer jurisdiction on this court, the State notes that a notice of appeal must be "*filed with the clerk of the trial court* within 30 days after the date of entry of the judgment or order." Utah R.App. P. 4(a) (emphasis added). If a defendant files a motion for new trial under rule 24 of the Utah Rules of Criminal Procedure, "the time ... to appeal from the judgment runs from the entry of the order disposing of the motion." *See id.* R. 4(b)(1). Therefore, the State contends that to appeal the trial court's denial of his Renewed Motion for New Trial, Johnson was required to file his appeal of that decision *with the trial court* within thirty days of the trial court denying that motion. In response, Johnson relies on the fact that rule 4 does not expressly state that an amended notice of appeal must also be filed in the trial court. While Johnson is correct, there is also nothing in the rule that provides different filing requirements for appeals based on orders entered by the trial court after the appellant has filed an appeal from a prior final judgment in the same case. *See generally id.* R. 4 (specifying the requirements for filing an appeal). In this case, however, the Second Appeal was unnecessary because the issues raised by it had been properly raised in his Original Appeal, which the State concedes was timely filed.

¶ 22 Both notices of appeal stated that Johnson was appealing from the trial court's orders concerning sentence, judgment, commitment, restitution,[9] and the denial of Johnson's first Motion for New Trial. The Second Appeal only differed from the Original Appeal in that the Second Appeal included the date of the trial court's restitution order and stated that Johnson was appealing the trial court's denial of his Renewed Motion for New Trial. In substance, the legal arguments contained in Johnson's initial and renewed motions for new trial were identical, and the motions only differed in the evidence

---

8. The State concedes that Johnson's Original Appeal, filed twenty-nine days after the trial court denied Johnson's first Motion for New Trial, was timely.

9. We address the timeliness of Johnson's appeal of the final restitution order in the next section.

cited by Johnson in support of his argument. Because the same issues were already raised by the Original Appeal, Johnson was not required to file a second notice of appeal for this court to have jurisdiction to address those issues.

### B. The Original Appeal Included Restitution.

¶ 23 The State argues that Johnson did not perfect his appeal of the trial court's December 5, 2007 restitution order because he filed the Original Appeal on November 8, 2007, almost a month *before* the trial court entered the order.[10] Relying on *State v. Garner*, 2005 UT 6, 106 P.3d 729, the State asserts that Johnson was required to perfect an appeal of the final restitution order by submitting a new notice of appeal within thirty days of its entry. Johnson disagrees, claiming both that the State's interpretation of *Garner* is incorrect and that the restitution order was part of the underlying judgment.

¶ 24 The Utah Rules of Appellate Procedure require that the judgment or order appealed from be final. *See* Utah R.App. P. 4(a). In *Garner*, the Utah Supreme Court considered the effect of a subsequent restitution hearing on the finality of a prior judgment. *See* 2005 UT 6, ¶¶ 11–16, 106 P.3d 729. There, the trial court entered judgment, sentencing Garner to prison and ordering him to pay restitution in an amount not yet quantified. *See id.* ¶ 2. Garner did not file a timely appeal of that judgment. *See id.* Subsequently, the trial court clarified its judgment to indicate that Garner's guilty plea was conditional. *See id.* Although Garner attempted to appeal his underlying conviction from the date of that clarification, this court rejected his appeal as untimely. *See id.* ¶ 5. Before the order from this court dismissing Garner's first appeal was entered, the trial court "re-entered the judgment, noting that the State had satisfied the conditions of the plea and setting the amount of restitution." *Id.* ¶ 3. In response, Garner filed a second notice of appeal, claiming that the trial court's reentry of the judgment "created

a new final judgment for purposes of appeal" and that he was entitled to a new thirty days to appeal the underlying conviction. *Id.* ¶ 4. This court disagreed, dismissing the second appeal of the underlying conviction as untimely. *See id.* ¶ 6.

¶ 25 On certiorari review, the supreme court affirmed, stating, "Entering a restitution amount is more like a clarification of a judgment than a material modification because the inclusion does not change the substance or character of the judgment." *Id.* ¶ 17 (internal quotation marks omitted). The supreme court upheld our dismissal of Garner's second appeal, holding "that where orders for restitution remain open to be decided at a later date, the subsequent entry of the amount of restitution is not a new and final judgment *for purposes of appealing the underlying merits of a criminal conviction.*" *Id.* (emphasis added).

¶ 26 Unlike in *Garner*, the issue here is not whether an appeal filed after entry of the restitution amount could give the defendant an additional thirty days to appeal the underlying conviction. Rather, this case raises the question of whether a defendant must file a new appeal where a trial court initially enters a restitution amount at sentencing and subsequently modifies that amount after holding a restitution hearing. In its original judgment, the trial court set restitution at $125,000, which the court said was "the same [amount] as [it] ordered for ... Schwenke." Johnson filed his Original Appeal on November 8, 2007, expressly challenging "the Court's ruling concerning Full Restitution." After Johnson filed the Original Appeal, the trial court modified the restitution amount to $120,000 to be paid jointly and severally by Johnson and Schwenke.

¶ 27 The State correctly contends that under *Garner*, a criminal proceeding may result in several final orders. *See id.* ¶¶ 15–16 (distinguishing finality in criminal and civil cases). Applying that possibility here, the State argues that the change in the restitution amount was a material modification of the judgment, necessitating a new notice of

---

10. The trial court set restitution in the amount of $125,000 when Johnson was initially sentenced on June 6, 2007, and modified the restitution amount to $120,000 in the December 5, 2007 order.

appeal. Johnson disagrees. Under the unique facts of this case, we agree with Johnson that a new notice of appeal was not required.

¶ 28 Before entering the original judgment in Johnson's case, the trial court held a restitution hearing in Schwenke's case and set Schwenke's restitution at $120,000.[11] Then, in entering judgment in Johnson's case, the trial court stated that it was ordering restitution at $125,000, which the trial court said was "the same as [it] ordered for ... Schwenke," and which Johnson and Schwenke were to pay jointly and severally. These statements establish that the trial court intended Johnson and Schwenke to pay the same amount of restitution, which the trial court had previously set at $120,000 in Schwenke's case. When the trial court changed the amount of Johnson's restitution to $120,000 after the restitution hearing, it merely changed the amount to correct an error it made when entering the original judgment.[12] Because that correction did not constitute a material modification of the trial court's original judgment, Johnson was not required to file a new notice of appeal. *See generally Gittins v. Smithfield City*, 2008 UT App 171, ¶ 6, 185 P.3d 1133 (mem.) (stating that "only *material* modifications of or amendments to a judgment ... affect the finality of an earlier court order," and that "clerical matters" that correct or amend a judgment do not materially modify the original judgment); *see also State v. Garner*, 2005 UT 6, ¶ 11, 106 P.3d 729 ("[W]here a belated entry merely constitutes an amendment or modification not changing the substance or character of the judgment, such entry is merely a nunc pro tunc entry which relates back to the time the *original* judgment was entered ....") (alteration in original) (internal quotation marks omitted). Consequently, we have subject matter jurisdiction over the restitution award pursuant to the Original Appeal. We now address the merits of Johnson's arguments on appeal.

## II. Whether the Sale Was For Value.

¶ 29 We first address Johnson's argument that section 61–1–1 does not apply because the transfer of assets was not for value. The determination of whether the transfer of assets meets the statutory definition of a sale for value under Utah Code sections 61–1–1 and –13 is a question of statutory construction. *See Gohler v. Wood*, 919 P.2d 561, 562 (Utah 1996). In interpreting a statute, we look to its plain language, unless it is ambiguous. *See id.* at 562–63. Where any statutory ambiguities exist, this court "broadly and liberally construe[s securities laws] to give effect to the legislative purpose" of "prevent[ing] fraud." *Technomedical Labs, Inc. v. Utah Sec. Div.*, 744 P.2d 320, 322 (Utah Ct.App.1987) (internal quotation marks omitted).

¶ 30 Under the plain language of the statute, section 61–1–1 applies only if Johnson's actions were "in connection with the *offer, sale, or purchase* of any security, directly or indirectly." *Id.* (emphasis added). Section 61–1–13 defines "sale" as "every contract for sale of, contract to sell, or disposition of, a security or interest in a security for value," Utah Code Ann. § 61–1–13(22)(a) (2000), and "offer" as "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value," *id.* § 61–1–13(22)(b). Thus, to prove a violation of the statute, the State had to prove that the transfer of American–Dairy stock was "for value." Johnson argues that the transfer of assets from the LLC to American–Dairy was not a sale for value because it was simply "a change in the form of ownership" of the farm assets and because the farm assets were "so encumbered as to be valueless."

### A. The Transfer of Assets Was a Sale for Value.

¶ 31 The Securities Act does not specifically define the term "for value," but in the

---

11. In a jury trial presided over by the same trial judge who presided over Johnson's case, Schwenke was convicted of securities fraud for his involvement in the transaction with the dairymen.

12. At the sentencing hearing, the prosecutor incorrectly stated, "I understand that the restitution in the Schwenke case is $125,000. I'm certainly appreciative of [defense counsel's] concession that that was a number that he can live with and [Johnson] can live with."

section defining a "sale" for value, the legislature provided several examples of the types of transfers that are governed by the statute, including

> the issuance of a security under a merger, consolidation, reorganization, recapitalization, reclassification, or acquisition of assets shall constitute the offer or sale of the security issued as well as the offer to buy or the purchase of any security surrendered in connection therewith, unless the sole purpose of the transaction is to change the issuer's domicile.

*Id.* § 61–1–13(22)(c)(vii). Thus, the legislature expressly intended that section 61–1–1 apply to a transfer of assets like that from the LLC to American–Dairy.

¶ 32 Johnson nevertheless argues that our previous decision in *Capital General Corp. v. Utah Department of Business Regulation,* 777 P.2d 494 (Utah Ct.App.1989), supports his position that the transfer of assets was not for value.[13] We disagree. In *Capital General,* a corporation acquired 100 million shares in another company and subsequently distributed 90,000 of those shares as gifts to its clients. *See id.* at 495. We rejected the argument that the gifts did not constitute a "sale for value," stating, " '[V]alue' can include enhanced abilities to borrow, raise capital, and other general benefits associated with publicly held companies.... [T]hese economic benefits render the disposition 'for value' under [the Securities Act], even though those benefits flowed indirectly from the marketplace rather than directly from the transferees." *Id.* at 497. Thus, we concluded that because the corporation received indirect benefits from the distribution, the transfer was "for value" under the Securities Act. *See id.*

¶ 33 Like the transfer in *Capital General,* the acquisition of the LLC assets "enhanced [American–Dairy's] ability to borrow," *see id.,* as evidenced by the $50,000 loan Schwenke obtained by using the farm assets as collateral. Indeed, American–Dairy received indirect benefits "from the marketplace," *see id.,* because the company now had

operational assets, including land, cattle, and equipment that would have increased the value of any stock it subsequently sold. Based on our holding in *Capital General* and the plain language of the Securities Act, we hold that the definition of a sale for value under Utah Code section 61–1–13(22)(a) was met here because the transfer of the farm assets from the LLC to American–Dairy conferred indirect benefits that, among other things, included an enhanced ability to borrow and raise capital. *See generally id.*

### B. The Evidence Supports that the Farm Was Worth at Least $10,000.

¶ 34 Johnson next contends that the property was so heavily encumbered that its value was less than $10,000 and that, in fact, it had no value. *See generally* Utah Code Ann. § 61–1–21(2)(b)(i) (Supp.2009) (stating that, to support a charge of second degree felony securities fraud, the State must show that "the property ... unlawfully obtained or sought to be obtained was worth $10,000 or more"). Accordingly, we review the record to determine whether there was evidence from which the jury could conclude that the property had a value of at least $10,000.

¶ 35 We agree with the trial court that the jury had sufficient evidence before it from which it could find beyond a reasonable doubt that the property had a value of at least $10,000. The State's evidence of the property's value included the dairymen's testimony that the farm equipment was worth between $150,000 and $200,000, the recital in the Agreement stating that the property had a value of $200,000, and the $50,000 loan that Schwenke obtained by recording a trust deed against the farm. Where there was evidence in the record from which the jury could find the property had a value of at least $10,000, as required by Utah Code section 61–1–21(2)(b)(i), we will not disturb the jury's decision on that point. *See State v. Wallace,* 2005 UT App 434, ¶ 16, 124 P.3d 259 ("[S]o long as some evidence and reasonable inferences support the jury's findings, we will not

---

13. Johnson also relies on *Premier Van Schaack Realty, Inc. v. Sieg,* 2002 UT App 173, 51 P.3d 24. Because that decision interpreted the term "val-

ue" in the context of a contractual provision rather than the Securities Act, *see id.* ¶ 13, it is not helpful to our analysis.

disturb them." (internal quotation marks omitted)).

### III. The Expert Testimony

■ ¶ 36 We next address Johnson's argument that the trial court committed reversible error by allowing Hines, the State's expert witness, to give testimony that "was riddled with impermissible legal conclusions" and "[i]ncorrect [i]nterpretation[s] of the [l]aw." In response, the State argues that the witness's testimony was admissible, and that even if it were not, Johnson was not prejudiced by the testimony.

■ ¶ 37 To prevail on appeal, Johnson must show that the testimony was both (1) admitted in error and (2) prejudicial. *See State v. Larsen,* 865 P.2d 1355, 1363 (Utah 1993); *State v. Davis,* 2007 UT App 13, ¶¶ 15–21, 155 P.3d 909; *State v. Tenney,* 913 P.2d 750, 756 (Utah Ct.App.1996). Because we conclude that Johnson was not prejudiced by the expert's testimony, we need not decide whether it was admitted in error.[14]

¶ 38 Johnson cannot meet his burden to show that he was prejudiced by Hines's testimony because the trial court correctly and promptly instructed the jury. In *Larsen,* the defendant appealed the trial court's admission of testimony from a securities expert regarding the materiality of the defendant's statements. *See Larsen,* 865 P.2d at 1357. The supreme court held both that the testimony was not improper and that the defendant was not prejudiced by the testimony. *See id.* at 1363. In reaching its conclusion that the defendant had not been prejudiced, the *Larsen* court noted that the trial court "correctly admonished the jury as to the relative roles of expert testimony and opinion evidence," and "gave careful instructions regarding the [relevant] legal definition." *Id.*

¶ 39 Here, shortly after Hines began his testimony, the trial court admonished the jury that "at some point in this trial the court is going to give you instructions with respect to . . ., issues of law that . . . will govern your deliberations. And . . . at that time . . ., the court will instruct you as to what the law is." Prior to deliberations, the trial court instructed the jury, "If an expert witness has expressed an opinion of the law which is in conflict with these instructions, you are to disregard the opinion of the expert witness." The trial court also accurately instructed the jury as to the law regarding the requirements of section 61–1–1 and the definitions of "sale," "material fact," "fraud," and "willful." As in *Larsen,* the trial court here "substantially reduced whatever slight risk of confusion [Hines's testimony] might have engendered in the jury." *Id.* Moreover, Johnson was able to cross-examine Hines at length regarding the alleged misstatements of the law and its application, and he called his own securities expert to rebut Hines's testimony. Those actions, combined with the trial court's prompt and correct instructions to the jury, alleviated any potentially prejudicial effects of Hines's testimony. Accordingly, we hold that any error in the admission of Hines's testimony was not prejudicial.[15]

### IV. Johnson's Due Process Claim

■ ¶ 40 We next address Johnson's claim that section 61–1–1, as applied in Johnson's case, is unconstitutionally vague under the Due Process Clause of the Utah Constitution, *see* Utah Const. art. I, § 7 ("No person shall be deprived of life, liberty or property, without due process of law."). A law is unconstitutional and "void for vagueness if its prohibitions are not clearly defined . . . . [so as to give] the person of ordinary intelligence

---

14. Nevertheless, we caution that there are limits on an expert's license to testify as to the legal meaning of a statute. Where the witness's legal conclusions "blur the separate and distinct responsibilities of the judge, jury and witness," or there is "danger that a juror may turn to the [witness's legal conclusion] rather than the judge for guidance on the applicable law," the expert has exceeded those limits. *State v. Davis,* 2007 UT App 13, ¶ 15, 155 P.3d 909 (alteration in original).

15. Because the jury instructions adequately explained that it was the trial court, not Hines, who would instruct the jury as to the meaning and requirements of section 61–1–1, we do not reach Johnson's claim that Hines's testimony violated the Separation of Powers Clause of the Utah Constitution. *See West v. Thomson Newspapers,* 872 P.2d 999, 1004 (Utah 1994) ("[C]ourts should avoid reaching constitutional issues if the case can be decided on other grounds.").

a reasonable opportunity to know what is prohibited, so that he may act accordingly." *West Valley City v. Streeter,* 849 P.2d 613, 615 (Utah Ct.App.1993) (internal quotation marks omitted). Johnson argues that the statute is unconstitutionally vague as applied to him for two reasons: First, because the State and its expert witness improperly stated the requirements of section 61–1–1(2) as it relates to omissions, and second, because the jury was incorrectly instructed that the State was not required to prove the dairymen relied on Johnson's statements or omissions in making their investment decision.

### A. The Trial Court Properly Applied the Statute.

¶ 41 Johnson maintains that, contrary to the assertions of the prosecutor and the State's expert witness, section 61–1–1(2) does not impose an affirmative duty to disclose all material facts. Johnson argues that the statute instead "requires proof of a material omission that renders a predicate statement misleading, in light of the circumstances in which it is made." Johnson further contends that, because no such predicate statements were proved, his conviction must have been based on some vague obligation to disclose. Such an undefined basis for conviction, he argues, violates his due process rights. We need not reach that issue, however, because we conclude that the instructions required the jury to find that a predicate statement was made and that the record supports the jury's finding that such predicate statements were made.

¶ 42 The jury instructions permitted the jury to find Johnson guilty only if it found that he "made an untrue statement of a material fact or *omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.*" (Emphasis added.) This instruction is

consistent with the plain language of section 61–1–1(2) and makes no mention of an affirmative duty to disclose in the absence of a prior statement. We presume the jury followed this instruction. *See State v. Harmon,* 956 P.2d 262, 273 (Utah 1998). Because the jury was not free to find Johnson guilty in the absence of a predicate statement, the statute was not unconstitutionally vague as applied to Johnson.[16]

¶ 43 Schwenke's statements regarding Johnson's background and experience were designed to create confidence in the transaction. Indeed, the dairymen testified that Johnson's qualifications "lent a great deal of credibility" to Schwenke's presentation, giving the dairymen a "false sense of security." The statements that Johnson was a "high powered lawyer" and a "security expert from out of New York" were misleading in light of the pending disciplinary proceedings against Johnson for misappropriation of client funds. Had Johnson disclosed the tenuous state of his membership in the Utah Bar and the reasons for the order of disbarment that had been entered but stayed pending appeal, it almost certainly would have undermined the false confidence created by Schwenke's statements. Thus, the jury could have reasonably found that predicate statements were made and that Johnson omitted to state a material fact necessary to make those statements not misleading.

### B. The Jury Was Properly Instructed on Reliance.

¶ 44 We next address Johnson's contention that the jury instruction regarding reliance was incorrect. At trial, the jury was instructed that

> it is not necessary for the State to prove that the individual investor believed the statements to be true, nor that he relied upon the statements in his decision-making process, so long as the statements made

---

**16.** We also reject Johnson's argument that section 61–1–1(2) requires that the person who omits a material fact also be the person who made the predicate statement. To conclude otherwise would inject language not found in the statute and allow a person to evade criminal liability by remaining silent while others make gross misstatements about the person's back-

ground, skills, experience, or other qualities. *See generally Dungan v. Smith,* 76 N.M. 424, 415 P.2d 549, 551 (1966) (upholding a finding of liability where one majority shareholder remained silent about the fact that the other majority shareholder had "demonstrated a capacity for misappropriation of funds").

were such that a reasonable person in similar circumstances would have relied upon the statements in making an investment decision.

Johnson argues that this instruction is unconstitutional because it "invites the jury to ignore the [dairymen's] testimony and instead substitute its own judgment of what information is important." We disagree. The supreme court, in *Gohler v. Wood,* 919 P.2d 561 (Utah 1996), held that section 61–1–1(2) does not contain a subjective reliance element. *See id.* at 563–64. The jury instruction here was correct. In addition, there was evidence of actual reliance in the form of the dairymen's testimony that Johnson's status as an attorney "lent a great deal of credibility" to Schwenke's presentation and gave the dairymen a "false sense of security" about the transaction.

## V. Restitution

¶ 45 Finally, we address Johnson's claim that the trial court's restitution order was erroneous both as to any award of restitution and as to the specific amount of restitution awarded. The trial court awarded restitution in the amount of $120,000, based on the $50,000 loan obtained by Schwenke and the extra $70,000 in expenses that the dairymen incurred to care for the additional cows Schwenke brought onto the farm. Johnson challenges the award of restitution because he was not convicted of theft in connection with the $50,000 loan that Schwenke obtained and secured by a trust deed on the farm. Likewise, Johnson argues that he was not convicted of any crimes related to the extra expenses incurred for the care and feeding of the additional cows. Finally, Johnson contends that the trial court failed to account for two payments that the dairymen received following foreclosure.

¶ 46 "When a person is convicted of criminal activity that has resulted in pecuniary damages, in addition to any other sentence it may impose, the court shall order that the defendant make restitution to the victims. . . ." Utah Code Ann. § 76–3–201(4) (2008). "Criminal activities" are defined as "any offense of which the defendant is convicted or any other criminal conduct for which the defendant admits responsibility to the sentencing court with or without an admission of committing the criminal conduct." Utah Code Ann. § 77–38a–102(2) (2008). "Pecuniary damages" are defined as "all demonstrable economic injury, whether or not yet incurred, which a person could recover in a civil action arising out of the facts or events constituting the defendant's criminal activities and includes the fair market value of property taken, destroyed, broken, or otherwise harmed." *Id.* § 77–38a–102(6). Interpreting these statutory provisions, this court requires a "sufficient nexus" between the defendant's criminal conduct and the pecuniary damages suffered by the victim. *See State v. Mast,* 2001 UT App 402, ¶ 13, 40 P.3d 1143. "Utah has adopted a modified but for test to determine whether pecuniary damages actually arise out of criminal activities," which test requires a showing "that (1) the damages would not have occurred but for the conduct underlying the . . . [defendant's] conviction and (2) the causal nexus between the [criminal] conduct and the loss . . . is not too attenuated (either factually or temporally)." *State v. Brown,* 2009 UT App 285, ¶ 11, 221 P.3d 273 (alterations and omissions in original) (internal quotation marks omitted).

¶ 47 Johnson claims that Schwenke caused the dairymen's pecuniary loss, independently of Johnson's fraud. We do not agree. Johnson's securities fraud gave the dairymen a "false sense of security" about the transaction, which resulted in them entering into the Agreement. That Agreement allowed Schwenke to obtain the $50,000 loan and burden the dairymen with the additional cows.[17] But for Johnson's fraud, the dairymen would not have suffered the damages related to foreclosure of the trust deed and the care and feeding of the additional cows.

17. The cows did not provide any revenue to the dairymen. Had the additional cows remained on the farm, they would have produced milk that could have been sold to offset the costs associated with their feeding and maintenance. However, as one of the dairymen testified, it generally takes several weeks for milk production to take place and the additional cattle did not generate any income because they were just "starting to produce some milk" when they were repossessed.

These damages flow from the fraudulent securities transaction and were properly charged against Johnson. *See generally State v. McBride,* 940 P.2d 539, 540–41, 544 (Utah Ct.App.1997) (holding that where the defendant stole a car that was impounded and negligently sold by the police at auction before the victim could recover the car, the defendant's criminal conduct was the but for cause of the victim's pecuniary loss because the defendant's "criminal act ... resulted in the impoundment that created the opportunity for the [negligent sale]").

¶ 48 Notwithstanding our conclusion that there is a sufficient nexus between Johnson's crime and the dairymen's damages, we agree that Johnson raises legitimate questions regarding the amount of restitution awarded by the trial court. Johnson notes that after the foreclosure, the dairymen received one check for $11,523.54 and another check for $12,500.00. The order of restitution does not address either of these credits. We therefore remand to the trial court for further proceedings to determine if these payments should offset the amount of the restitution order.

## CONCLUSION

¶ 49 The transfer of assets from the LLC to American–Dairy was a sale for value. Even assuming that the expert's testimony was improper, it was not prejudicial. Section 61–1–1(2) was not unconstitutionally vague as applied to Johnson. Accordingly, we affirm Johnson's securities fraud conviction. There was a sufficient nexus between Johnson's criminal conduct and the pecuniary damages suffered by the dairymen, and we affirm the trial court's determination that restitution was appropriate. We remand, however, for further proceedings to determine whether the amounts received by the dairymen after the foreclosure sale of the farm should be deducted from the amount of restitution.

¶ 50 WE CONCUR: GREGORY K. ORME and WILLIAM A. THORNE JR., Judges.