Opinion
GREENWOOD, Senior Judge:
{1 Defendant Joshua Paul Chapman appeals his conviction for securities fraud, a second degree felony. We affirm.
BACKGROUND
{2 In 2005, Sterling Madsen, who had known Chapman and his family for many years, invested $30,000 in a "hard money loan" [2] for which Chapman acted as an intermediary.[3] In accordance with the terms of the loan, Chapman promptly returned the $30,000 back to Madsen with interest. In October 2006, Chapman contacted Madsen with another hard money investment opportunity involving a third party, Dennis Row-ley. Rowley sought a $70,000 hard money loan to finance improvements to a house that would "almost double" its appraisal value. Rowley agreed to repay the loan in fifty-one days at 100% interest and would obtain the funds to do so by taking out a home equity loan against the property upon completion of the renovation project.
13 Madsen wanted to think the proposal over for a week and expressed concern to Chapman as to whether Rowley "could pull this off" because the interest rate was "astronomical" and the terms of the proposed written agreement indicated that the note was not secured. Chapman reassured Madsen that he believed Rowley was capable, which Madsen interpreted as an indication that Chapman "had checked [Rowley] out well enough that [Chapman] had confidence in him" and that this deal would go smoothly "just like the last client" with the $30,000 loan. Madsen also recalled Chapman de-seribing having "some kind of ... a doeument that would allow [them] to go and get that property if Mr. Rowley couldn't perform." Chapman did not show Madsen any such document but assured him that Row-ley's house had " 'plenty of equity in it'" and that they could " 'easily get [Madsen's] principal and interest back'" if it came to that.
14 Madsen ultimately agreed to the deal because of the trust he had developed in Chapman "over years of knowing him and his family and of ... having at least one prior *233 business deal with him." At no point in the discussions leading up to the agreement did Chapman inform Madsen that he was expecting a $70,000 commission from the transaction, meaning that Rowley agreed to pay 200% interest on the loan, for a total obligation of $210,000.
15 Two weeks later, Madsen entered into another hard money loan with Chapman as the intermediary and Rowley as the borrower. This time, Madsen agreed to lend Row-ley $140,000 at 4% monthly interest, which Rowley intended to use on a completely different project. Madsen borrowed the funds needed for this second transaction through a home equity loan on a rental property he owned.[4]
T6 The $70,000 note became due on December 15. Madsen, having received no payments, contacted Chapman a week later. Chapman explained that Rowley had apparently encountered "some kind of water damage in this house that he was buying, and that now he was going to go sue the seller" and that he would be unable to pay the $70,000 note back until "he wrapped that up." Madsen followed up some time later, and Chapman informed him that things were still " 'kind of up in the air'" and that he did not know when Rowley would have Madsen's money.
T7 During this conversation, Madsen inquired about utilizing the document that Chapman had described in conjunction with the $70,000 loan that purportedly allowed them to "go get [Rowley's] house if anything went wrong and Mr. Rowley couldn't finish this project himself" Chapman admitted that he did not have "that document" and later testified that the document was for a lease option and provided no security for the note. Madsen also reminded Chapman that Chapman had promised to pay Madsen back himself if anything went wrong with the deal. Chapman denied personally guaranteeing the loan, but Madsen recalled Chapman indicating only that he could not afford to pay him back his investment. Madsen later discovered that the property was for sale. By then, Rowley had "disappeared." Chapman told Madsen that the last he knew of Rowley was that "he was living out of his car" and that "he just emailed [Chapman] now occasionally." Chapman then supplied Madsen with a copy of a promissory note between Chapman and Rowley signed on the same date the $70,000 note was executed, in which Madsen learned that Chapman expected to receive a $70,000 commission on the deal.
T8 The State charged Chapman with two counts of securities fraud based on his role as intermediary for the two hard money loans between Madsen and Rowley.[5] Before trial, the State indicated its intent to call Michael Hines, the then-Director of Enforcement at the Utah Division of Securities, as an expert witness at trial Chapman unsuccessfully moved to exclude all legal conclusions, legal definitions, and opinions on ultimate issues from Hines's testimony. A jury trial was held in October 2011. At the close of the State's evidence, and several other times, Chapman moved for a directed verdict. At the close of all of the evidence, he renewed his directed verdict motion on the basis that the State did not present sufficient evidence to establish willfulness, a necessary element of both of the charges against him. The trial court denied the motions, ruling that willfulness was "an issue for the trier of fact." The jury convicted Chapman of one count of seeu-rities fraud related to the $70,000 loan and acquitted him of the second count of seeurities fraud based on the $140,000 loan. Chapman appeals.
ISSUES AND STANDARDS OF REVIEW
19 Chapman raises two issues on appeal. First, he argues that the trial court erred by denying his motions for directed verdict because the State did not introduce sufficient evidence to prove the willfulness element of securities fraud. We reverse "a trial court's denial of a motion for directed verdict ... on the basis of insufficiency of the evidence ... only if, viewing the evidence in the light most favorable to the prevailing party, we conclude that the evidence is insufficient to support the verdict." Brewer v. *234 Denver & Rio Grande W. R.R., 2001 UT 77, ¶33, 31 P.3d 557 (citation and internal quotation marks omitted); accord State v. Harrison, 2012 UT App 261, ¶ 10, 286 P.3d 1272.
110 Second, Chapman argues that the trial court exceeded its discretion by allowing the State to elicit legal conclusions on ultimate issues from its expert witness. "It is within the discretion of the trial court to determine the suitability of expert testimony in a particular case, and we will not reverse that determination on appeal in the absence of a clear showing of abuse." State v. Johnson, 2009 UT App 382, ¶ 17, 224 P.3d 720 (citation and internal quotation marks omitted).
ANALYSIS
I. Directed Verdict
{11 Chapman argues that the trial court erred by denying his motions for directed verdict because the State failed to provide sufficient evidence that he acted willfully. The Utah Uniform Securities Act states,
It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly to:
(1) employ any device, scheme, or artifice to defraud;
(2) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the cireumstances under which they are made, not misleading; or
(3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.
Utah Code Ann. § 61-1-1 (LexisNexis 2011). In addition, the Act provides, "[A] person who willfully violates Section 61l-1-1 ... is guilty of a second degree felony if, at the time the crime was committed, the property, money, or thing unlawfully obtained or sought to be obtained was worth $10,000 or more." Id. § 61-1-21(2)(b). In this context, to act willfully "means to act deliberately and purposefully, as distinguished from merely accidentally or inadvertently," and "when applied to the intent with which an act is done or omitted, [willful] implies a willingness to commit the act" but "does not require an intent to violate the law or to injure another or acquire any advantage." State v. Larsen, 865 P.2d 1355, 1358 n. 3 (Utah 1993) (interpreting the willfulness requirement in section 61-1-21 of the securities fraud statute). The jury was instructed that it could find that 'Chapman had acted willfully, ie., made a willful misstatement or omission of a material fact, if it determined that Chapman "consciously avoided the existence of a fact or facts" but that he could not "be convicted if he was merely negligent, careless or foolish"; "hle must have acted with a conscious objective or desire to ignore a material fact or facts." The jury instructions defined "material fact" as "something which a buyer of ordinary intelligence and prudence would think to be of importance in determining whether to buy or sell a security." The jury was also instructed that for an omission to be "material" it must be a matter which:
(a) a reasonable person would attach importance to its existence or nonexistence in determining his or her choice of action in the transaction in question; or
(b) the person making the omission knows or has reason to know that the person regards or is likely to regard the matter as important in determining his or her choice of action, although a reasonable person would not so regard it.
112 As Chapman points out, there is evidence in the record suggesting that inexperience and bad luck are to blame for Madsen's losses, rather than willfulness on Chapman's part. This includes evidence of Chapman's young age at the time of the loans (mid-twenties), his limited education, and his few years of experience in the real estate market, which occurred entirely during a "boom" in the local housing market. Likewise, Chapman's testimony of his and Madsen's preexisting friendship and their families' connections could negate a finding of willfulness on his part.
1 13 However, there is also evidence in the record supporting the State's contentions. The State argued that Chapman made several willful misstatements or omissions of mate *235 rial fact and contends that any one of those statements can support Chapman's convietion. The State asserts that Chapman's conviction could rest on his having vouched for Rowley's ability to repay the $70,000 loan at 100% interest without disclosing the fact that his opinion was not informed by any actual research into Rowley's financial background. Likewise, the State contends that Chapman's failure to disclose the $70,000 commission he was expecting from that loan amounted to a misrepresentation of the terms of the loan to Madsen; Chapman told Madsen that Rowley would repay the $70,000 loan with 100% interest for a total of $140,000, when Rowley had actually agreed to repay the loan with 200% interest for a total of $210,000. Given Madsen's skepticism of Rowley's ability to pull off the deal at 100% interest, the jury could reasonably determine that either of these actions by Chapman constituted a willful material misstatement or omission of a material fact. See generally infra 1 21.
€ 14 The State also argues that Chapman falsely represented the existence of collateral for the $70,000 loan. Chapman testified that he was aware that the document Madsen believed created a security interest in Row-ley's property was actually an assignment of contract rights and did not create a security interest but that he nonetheless informed Madsen that he "had a document to hopefully back up [the] deal," Chapman testified that he clearly communicated the risks associated with the $70,000 loan, including that the loan was not secured and that this lack of collateral was why he was able to negotiate such a high interest rate. And Madsen testified that he had read the terms of the promissory note describing the note as unsecured and then indicated that this was a "sticking point" for him. Nonetheless, there is sufficient evidence in the record for the jury to determine that Chapman misstated a material fact by representing the document as more than it was in order to assuage Madsen's concerns about the risk of the investment. Accordingly, the trial court did not err in denying Chapman's motions for directed verdict based on insufficient evidence of willfulness.
II. Expert Testimony
{15 Next, Chapman argues that his conviction should be reversed because the trial court erroneously permitted the State to elicit legal conclusions on ultimate issues from its expert witness, Michael Hines.[6]
116 "The trial court has wide discretion in determining the admissibility of expert testimony, and such decisions are reviewed under an abuse of discretion standard. Under this standard, we will not reverse unless the decision exceeds the limits of reasonability." State v. Stringham, 957 P.2d 602, 607 (Utah Ct.App.1998) (citation and internal quotation marks omitted). Appropriate expert testimony will "help the trier of fact to understand the evidence or to determine a fact in issue." Utah R. Evid. 702(a). In securities cases in particular, "expert testimony may be appropriate ... because the technical nature of securities'is not within the knowledge of the average layman or a subject within the common experience and would help the jury understand the issues before them."" State v. Larsen, 865 P.2d 1355, 1861 (Utah 1998) (citation and internal quotation marks omitted).
{17 An expert witness may testify in the form of an opinion and can opine on an ultimate issue at trial "as long as that testimony is otherwise admissible under the rules of evidence." Id. at 1863 (construing rule 704 of the Utah Rules of Evidence); see also Utah R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue."). An expert witness exceeds the seope of permissible testimony when "the witness's legal conclusions blur the separate and distinct responsibilities of the judge, jury and witness, or there is danger that a juror may turn to the [witness's legal conclusion] rather than the judge for guidance on the applicable law." State v. Johnson, 2009 UT App 382, 187 n. 14, 224 P.3d 720 (alteration in original) (citation and internal quotation marks omitted). "No 'bright line' separates permissible ultimate issue testimony under *236 rule 704 and impermissible 'overbroad legal responses' a witness may give during questioning," State v. Davis, 2007 UT App 13, 16, 155 P.3d 909 (citation omitted), and a "trial court has wide discretion in determining the admissibility of expert testimony," Larsen, 865 P.2d at 1861.
T18 Chapman raises three specific challenges to Hines's testimony. He claims that Hines impermissibly testified as to the meaning of the terms "security," "material fact or omission," and "predicate statement," which had the effect of telling "the jury what result to reach." We address each challenge in turn.
A. The Meaning of "Security"
119 First, Chapman contends that for the jury to convict him on the first count of securities fraud,; it needed to decide whether the unsecured promissory note for the $70,000 loan constituted a security. Chapman argues that Hines "told the jury that the transaction at issue would constitute a security" by testifying that promissory notes and "notes that are issued for investment purposes and are not collateralized" are seeu-rities.[7]
120 Hines testified that there are "two different forms" of securities-those that are explicitly enumerated in the Utah Code as a security, see Utah Code Ann. § 61-I-13(1)(ee) (LexisNexis 2011), and those "that need an explanation in which elements are met to define the transaction as a security." In response to the State's question as to whether promissory notes, in general, can be securities, Hines explained that "notes that are issued for investment purposes and are not collateralized are" recognized in the industry as securities while "[nlotes that are issued in which there is collateral attached ... [are] less likely a security." Hines explained in broad terms how those in the industry may characterize a transaction that is not clearly enumerated in the Securities Act as a security. Hines did not tell the jury that the transaction at issue was a security, couch his opinion specifically in terms of what is required under Utah law, or otherwise tell the jury what conclusion to reach. Compare, e.g., Larsen, 865 P.2d at 1861 & n. 10 (holding that an expert witness's testimony on an ultimate issue was admissible, recognizing that the expert did not specifically testify that the defendant was guilty or "that, as a matter of law, the facts satisfied the [applicable] legal standard"), with Davis, 2007 UT App 18, ¶17, 155 P.3d 909 (determining that a witness's testimony should have been excluded where the witness connected his opinion testimony "to the requirements of Utah law" and answered "a specific question" on the verdict form (citations and internal quotation marks omitted)), and Stringham, 957 P.2d at 607 (holding that the trial court erred in permitting the prosecutor to pose a hypothetical seenario to an expert witness "consisting of the exact actions of which [the] defendant was accused" in order to ask the expert "to give an opinion as to whether the[ ] actions were illegal" (emphasis omitted)). Accordingly, the trial court did not abuse its discretion in permitting Hines to testify as to the meaning of "security."
B. Meaning of "Material Information" [8]
121 For the jury to convict Chapman on the first count of securities fraud, it also *237 needed to decide whether Chapman misstated or omitted a material fact in relation to the $70,000 loan. Chapman contends that Hines impermissibly "tied his examples" of what constitutes "material information to the State's allegations.[9] Chapman claims that Hines testified that a seller is "required" to disclose
(1) the "risks associated with an investment"; (2) any "compensation or commission"; (8) "your ability to get your money back"; (4) "all financial information concerning the issuler]," including whether "the principals have civil histories, bankruptcies, criminal histories"; (5) whether "the individuals who are offering and selling the securities are [] licensed"; and (6) "the financial condition of the issuer."
(Alterations and omission in original.) Chapman has taken these statements out of context. Hines did not list these items as required disclosures but as "some examples" of the information that he believed is important "flor a purchaser of a security to make an intelligent investment decision." While these observations by Hines "express an opinion regarding the ultimate resolution of [a] disputed issue," the testimony does not eross the line drawn by rule 704 of the Utah Rules of Evidence. See State v. Larsen, 865 P.2d 1355, 1363 (Utah 1993). Hines's testimony was relevant in "help{ing] the trier of fact to understand the evidence or to determine a fact in issue," see Utah R. Evid. 702(a), by explaining what concerns may drive an investor's decision to purchase a security. Compare Larsen, 865 P.2d at 1861 (determining that an expert's opinion testimony "that some of the material that [the defendant] had omitted from the securities documents could have been important or significant to an investor" was admissible), with State v. Tenney, 913 P.2d 750, 756 (Utah Ct.App.1996) (holding inadmissible expert testimony that included statements "that failure to disclose certain enumerated information would be a material omission under Utah law," "that the material actually provided to investors did not meet disclosure requirements under the Act," and that the agreements at issue "were securities under Utah law"). Accordingly, the trial court did not abuse its discretion by admitting this part of Hines's testimony.
C. Meaning of "Predicate Statements"
122 Last, Chapman argues that Hines explained the concept and identified specific examples of "predicate statements" made by Chapman in his dealings with Mad-sen that are prohibited by the Securities Act.[10] See State v. Schwonke, 2009 UT App *238 345, ¶ 14, 222 P.8d 768. In particular, Chapman argues that Hines identified Chapman's statement vouching for Rowley as "a guy that can be depended upon" as a predicate statement and explained that in order to "lawfully" comply with the disclosure requirements of the Utah Uniform Securities Act, Chapman needed to follow up with further explanation, ie., "a description of his investigation into Rowley's criminal history, courts history, databases or a disclaimer that he had not done any verification to support his opinion." (Internal quotation marks omitted.)
{23 In context, however, Hines's testimony was far more generalized than Chapman lets on. In response to questions based on Chapman's statement vouching for Rowley, Hines stated,
It is my opinion [if] that is said in connection with a securities transaction, in connection with the offer, sale or the purchase of a security, that is what I referred to . earlier as a predicate statement, a statement that may or may not need more information to be clarified. A statement of that nature then needs to be followed up to be complete with, "This is how I know that he's dependable," or that, "This is merely my opinion, and I haven't done any verification," before the investor can understand the importance of that statement.
Hines's unremarkable opinion that "a statement [like] that" "may" require clarification does not "transgress([ ] into the area reserved for the jury by instructing the jury as to what legally constitutes" a predicate statement or material omission. See Larsen, 865 P.2d at 1861; see also Utah R. Evid. 704 (permitting an expert witness to express an opinion on an ultimate issue as long as that testimony is otherwise admissible under the rules of evidence). Accordingly, the trial court did not abuse its discretion by permitting that testimony.[11]
CONCLUSION
24 The trial court correctly denied Chapman's motions for directed verdict The State presented sufficient evidence to prove that Chapman acted willfully in connection with the $70,000 loan. The trial court did not abuse its discretion by admitting Hines's testimony as to the meaning of "security," "materiality," and "predicate statements" and Hines did not offer impermissible legal conclusions in his testimony. We affirm the trial court's decision.

. Hard money loans are most commonly used in connection with real estate transactions and offer an alternative to conventional loans "[when financing is difficult to obtain." Mortgages: Hard Money, 40-Mar. Real Est. L. Rep. 6, 6 (2011). Hard money loans "carry much higher interest rates than conventional loans" and are generally secured by the property in which the loan is invested. Id. The lenders involved "are not commercial banks or other traditional lenders; instead they often are private investors familiar with their local economy." Id. An individual involved in flipping houses may seek out "hard money loans for short-term financing, with the first proceeds of a sale used to pay off the loan." Id. at 7.

. We recite the facts in a light most favorable to the jury's verdict. State v. Kruger, 2000 UT 60, ¶2, 6 P.3d 1116.

. Chapman was acquitted of a second count of securities fraud based on the $140,000 loan.

. Rowley was a co-defendant in this case and pleaded guilty.

. Chapman did not object to Hines's qualifications to testify as an expert witness. Consequently, there is no issue of qualification in this case. ©

. Chapman also argues that Hines's testimony explaining that "a transaction is 'more likely a security' if 'the people involved use the term investment'" was improper because "[dJuring trial, the witnesses repeatedly called the loan an investment." This argument is without merit, particularly in light of the fact that the only individuals that used the term "investment' to refer to the $70,000 loan during trial were Chapman, defense counsel, and the prosecutor.

. Judge Pearce's concurring opinion concludes that the trial court abused its discretion in admitting Hines's testimony regarding materiality because that testimony was within the knowledge and experience of an average layperson and therefore unhelpful. See generally Utah R. Evid. 702(a) (requiring an expert's testimony to "help the trier of fact to understand the evidence or to determine a fact in issue"). While we agree that the trial court failed to address "whether the testimony would actually be helpful to the jury," see infra 128, the reason for the omission is obvious: counsel never raised those specific questions. Chapman has maintained a fairly narrow position throughout the proceedings, requesting only that Hines be prohibited from offering legal conclusions in his testimony, specifically, that he be prohibited from testifying as to whether the individual promissory notes at issue in this case amounted to securities and whether *237 the specific acts or omissions alleged in this case were material. Chapman has explicitly stated that he was not seeking to exclude Hines from testifying, that Hines should be permitted to testify as to "what the test is to determine whether a promissory note is considered a security," and that Hines could "also provide the definition of materiality." Although Chapman also argued at times that Hines should not be permitted to define "materiality," he based this assertion on the lack of a statutory definition of the term and made only a passing reference to helpfulness. Accordingly, we do not consider the issues addressed in Judge Pearce's concurring opinion to be properly before this court for our disposition. See State v. White, 2011 UT 21, ¶34, 251 P.3d 820 (noting that Utah appellate courts will generally refrain from addressing an argument outside the scope of the issues presented); of. State v. Robison, 2006 UT 65, ¶¶16, 22, 147 P.3d 448 (explaining that because an unargued and un-briefed legal theory "was never subjected to the rigors of the adversarial process," appellate courts "should not normally search the record for unargued and unbriefed reasons to reverse a [district] court judgment" (alteration in original) (citation and internal quotation marks omitted)).

. Chapman also asserts that Hines "incorrectly asserted that the securities fraud statute imposed an affirmative duty to investigate and disclose certain material information." The record contains no such statement by Hines; indeed, Hines testified to, the opposite: "Individuals selling securities] have to make sure that any statement they make is truthful, and that they do not omit any material fact if they make a predicate statement. An omission by itself is not actionable. The fact that there is some fact available is not actionable." (Emphasis added.) We therefore do not reach this issue. Cf. State v. Wallace, 2005 UT App 434, ¶¶ 14-15, 124 P.3d 259 (declining to address whether the willfulness element in securities fraud cases imposes on the seller an affirmative duty to investigate), aff'd, 2006 UT 86, 150 P.3d 540.

. This argument implies that the phrase "predicate statement" refers to an abstract legal concept. We have not found any support for such a presumption. Utah courts and other jurisdictions employing the phrase in securities cases have not used it in association with any specific legal definition; rather, the term is used as short *238 hand to refer to a statement alleged to be false or misleading due to the accused's alleged material omission. See, eg., State v. Johnson, 2009 UT App 382, ¶¶41-43, 224 P.3d 720; State v. Schwenke, 2009 UT App 345, ¶¶11, 14-15, 222 P.3d 768; see also, eg., Cozzarelli v. Inspire Pharm. Inc., 549 F.3d 618, 630 (4th Cir.2008); Fener v. Belo Corp., 513 F.Supp.2d 733, 746 (N.D.Tex.2007). In other words, the case law utilizes the term to refer to the unwieldy statutory language prohibiting a "person, in connection with the offer, sale, or purchase of any security, directly or indirectly to ... omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." See Utah Code Ann. § 61-1-1(2) (LexisNexis 2011).

. Chapman also argues that Hines's testimony should have been excluded under rules 702 and 403 of the Utah Rules of Evidence because its probative value was outweighed by the danger of unfair prejudice and because he was in fact prej'udiced by the testimony. In making this argument, Chapman simply repackages the assertions addressed above to claim that any probative value of Hines's testimony was outweighed by the prejudice resulting from the legal conclusions contained in the testimony because such legal conclusions "blur{red] the separate and distinct responsibilities of the judge, jury, and witness." See State v. Davis, 2007 UT App 13, ¶15, 155 P.3d 909 (citation and internal quotation marks omitted). We reject this argument for the same reasons we reject Chapman's other challenges to Hines's testimony. See supra M1 15-22.