STATE of Utah, Plaintiff and Appellee,

v.

Robert W. STRINGHAM, Defendant and Appellant.

No. 960426–CA.

Court of Appeals of Utah.

April 23, 1998.

Jerome H. Mooney and Wendy M. Lewis, Salt Lake City, for Appellant.

Jan Graham and Barnard N. Madsen, Salt Lake City, for Appellee.

Before DAVIS, P.J., WILKINS, Associate P.J., and ORME, J.

## OPINION

ORME, Judge.

Defendant Robert W. Stringham appeals from convictions of one count of engaging in a pattern of unlawful activity, a second degree felony, in violation of Utah Code Ann. § 76–10–1602 (Supp.1997); three counts of communications fraud, second degree felonies, in violation of Utah Code Ann. § 76–10–1801 (Supp.1997); and twelve counts of theft, of which six were second degree felonies, five were third degree felonies, and one was a Class A misdemeanor, in violation of Utah Code Ann. §§ 76–6–404 (1995) and –412 (Supp.1997).[1] We reverse the communications fraud convictions and remand for a new trial. Otherwise, we affirm.

## FACTS

Even though defendant sees the facts much differently, and there is evidence in the record that, in varying degrees, supports his view, we are obligated to consider "the facts in the light most favorable to the jury's verdict." *State v. Cosey*, 873 P.2d 1177, 1178 (Utah Ct.App.), *cert. denied*, 883 P.2d 1359 (Utah 1994).

The charges against defendant arose out of activities which occurred between 1990 and 1992 while defendant was employed by As-

1. As a convenience to the reader, and because the provisions in èffect at the relevant times do not differ materially from the statutory provi- sions currently in effect, we cite to the most recent statutory codifications throughout this opinion.

sessment and Psychotherapy Associates (APA). In May 1989, APA employed defendant and his wife to open a satellite office in Utah County. Defendant and his wife both had training and experience as drug and alcohol counselors. APA hired defendant as a part-time employee to manage the office and to provide limited counseling services for which he was to be paid a total salary of $400 per month. Defendant's wife was hired to provide clinical counseling services for which she was to be paid $25 an hour. Both defendant and his wife received paychecks in their own names from APA. In addition, APA also made monthly and other payments to defendant and his wife with checks payable to "GS Consulting,"[2] although APA never contracted directly with "GS Consulting."

### A. Communications Fraud

Defendant received a regular pension as a former employee of United States Steel. Under the pension plan, if he earned less than $5500 per year, defendant could qualify for an annual pension supplement of $4800. If he earned more than $5500 per year, defendant could still qualify for a supplement, but it would be significantly less than $4800. To qualify for a supplement, the pension fund required defendant to submit a report each year recording his actual income for the past year, with a copy of his W–2 or other proof of earnings, and an estimate of his income for the upcoming year.

Because APA made additional payments to defendant, primarily through GS Consulting, defendant's W–2 did not reflect all of his

actual 1990, 1991, and 1992 income. The State alleges that defendant omitted a total of $47,225.75 in annual reports of his income to the pension fund over three years. As a result, he received a total of $13,475 in low income pension supplements to which he was not entitled. Thus, defendant was charged with three counts of communications fraud, one count for each year. *See* Utah Code Ann. § 76–10–1801 (Supp.1997); *infra* note 17 (quoting relevant portions of § 76–10–1801).

### 1. 1990

In 1990, defendant's APA salary was $400 per month; thus, his W–2 reflected his annual income as $4800. Defendant recorded this amount on the report of his actual income to the pension fund and attached a copy of his W–2. The report also required defendant to "[w]rite in other earned income," and defendant entered "0" and listed his "[t]otal income" as "$4800.00." However, by oral agreement,[3] APA also paid defendant, in addition to his salary, $600 per month for eight months and $800 per month for four months as draws against revenues that defendant was expected to bring into APA. These amounts were paid to GS Consulting at defendant's request, although they were meant to compensate defendant. Defendant did not include these amounts in the report of his actual income to the pension fund.[4] Defendant also failed to include a check for $912.75 *made payable directly to defendant* for "ad-

2. Defendant and his wife opened a joint checking account under the name "GS Consulting" after they were married. The initials "GS" apparently stood for "Gail Stringham," the name of defendant's wife. "GS Consulting" was never registered as an assumed name or as any kind of business entity. In fact, for income tax purposes, "GS Consulting" used Gail Stringham's social security number as its taxpayer identification number.

3. This initial agreement between the parties is not in dispute. However, over the next two years their agreement changed numerous times, and there is little consensus as to exactly how the agreement changed.

4. Defendant asserts that GS Consulting, which defendant describes as his wife's sole proprietorship, acted as operator of the drug and alcohol

counseling at the new satellite office. Defendant further maintains that it was agreed there would be a profit split of 60/40, with 60% of the profits going to GS Consulting and 40% to APA. According to defendant's version of this agreement, APA would distribute three checks each month to defendant and his wife: one for defendant's salary, one for his wife's salary, and one representing the 60% profit to GS Consulting. Eventually, defendant contends, the agreement between GS Consulting and APA changed so that 75% of the profit went to GS Consulting and 25% to APA. However, after the initial agreement, while the drug and alcohol counseling was beginning to get underway, defendant agrees that APA paid GS Consulting a draw of $600 per month, which was later increased to $800 per month.

ditional money[ ] that he felt was owing in [May]."

In sum, defendant's actual income for 1990 was $13,712.75. Thus, defendant failed to report nearly $9000 to the pension fund.

## 2. 1991

In 1991, defendant again reported to the pension fund that his actual annual income was $4800, thus qualifying him for the maximum low income pension supplement of $4800, which he received. APA continued to pay defendant his $400 per month for 1991. However, APA also paid defendant draws of $800 for one month and $900 a month for six more months, but defendant failed to include these amounts in the 1991 report to the pension fund. At defendant's request, these amounts were paid to GS Consulting.

In August 1991, APA and defendant came to an agreement whereby APA put defendant in charge of payroll. Both APA's administrator, Art Marshall, and Marie Jackson, an APA administrative assistant, testified as to the agreement's terms. Defendant was to receive his regular salary of $400 per month, plus $700 per month—made payable to GS Consulting, at his request—for his additional bookkeeping responsibilities.[5] Defendant failed to include the payments for bookkeeping in his report to the pension fund. The agreement also provided that defendant would only be paid the $1100 per month and not receive additional compensation for any other services.[6]

Under this August agreement, defendant also received $5000 (also made payable to GS Consulting) for additional work he performed on a Domestic Violence Treatment Program. Again, this payment was made payable to GS Consulting, and defendant failed to include this amount in his 1991 report to the pension fund.[7]

APA contends that a written memorandum documenting this agreement existed, but was stolen, along with the floppy disk on which the memorandum was stored, in a break-in at APA in September 1992. Defendant and his wife, however, assert that no agreement was ever reduced to writing. In any event, during the remainder of 1991, defendant received an additional $5100 from APA, made payable to GS Consulting, which he failed to report to the pension fund. See also infra notes 9, 10.

In sum, defendant's actual income for 1991 was about $24,600. Thus, had he reported the entire amount to the pension fund, he would not have been eligible for the low income supplement of $4800 that he received.

## 3. 1992

Defendant and his wife resigned from APA in August 1992, and thus, defendant received his $400 paycheck only through July 1992.[8] Consequently, defendant reported to the pension fund that his annual income for 1992 was $3200 and qualified him for the low income pension supplement of $4800, which the fund paid defendant for 1992.

However, APA had made additional payments for the benefit of defendant, namely $700 per month to GS Consulting for book-

---

5. At trial, a witness testified that in the summer of 1991, when she was a prospective APA employee, defendant told her that he made $400 per month from APA, but "needed $1,100.00," so he directed that an additional $700 be paid to GS Consulting.

6. It is agreed only that APA's principals made significant changes to the agreement in August 1991; the exact nature of those changes is in dispute. On this point, defendant asserts that he was to continue to receive his salary of $400 per month and that GS Consulting would continue to receive $600 per month, as a draw against future profitability, and an additional $300 per month for bookkeeping services, for a total of $900 per month, as opposed to $700. Also, defendant's wife testified that this amount increased again in

October 1991, to $1600 per month for GS Consulting, because she had taken over more administrative matters.

7. Defendant maintains that the $5000 "was not for work necessarily performed by [defendant] but was for work performed by GS Consulting."

8. Defendant's wife testified that they left APA because she needed more time to work on her dissertation, because APA did not have sufficient interest in drug and alcohol counseling, and because she felt APA was having financial difficulties. On September 1, 1992, defendant and his wife wrote APA a letter with an accounting of funds that they believed were still owing to them. Their itemization totalled $34,207.05.

keeping and payroll services he provided. Defendant did not include this $4900 in the report to the pension fund. Also, defendant received an additional $9,813 from APA, through GS Consulting, which he failed to report to the pension fund. *See also infra* notes 9, 10. Defendant's actual income for 1992 was $17,513, or $14,313 more than he reported to the pension fund. Thus, by reason of his under-reporting, defendant again qualified for and received the low income supplement from the pension fund.

### 4. IRS Agent

At trial, the State called an agent from the Internal Revenue Service to answer hypothetical questions regarding the legality of assigning income. The only relevance of the IRS expert's testimony would have been to establish that assigning income to GS Consulting was illegal for the purposes of defendant's pension. However, the expert only testified as to what would be illegal for federal income tax purposes, which was not at issue. Defense counsel objected to the agent being qualified as an expert and to his testimony in general. The trial court, however, overruled the objection.

### B. Theft

The State contends that, after APA gave defendant control of the company's bookkeeping in August 1991, defendant employed two schemes to cause APA to overpay GS Consulting by nearly $15,000 for the months of August 1991 through July 1992. First, defendant "double-charged" for his counsel-

ing hours by assigning them to his wife and billing APA at her hourly rate, while at the same time receiving his salary.[9] Second, defendant "padded" his hours by adding varying amounts to monthly compensation checks from APA to GS Consulting for work that neither he nor his wife performed.[10] APA did not notice the over-billing until its administrator, Art Marshall, took back payroll and check-writing responsibilities from defendant in August 1992. While computing the July payroll, Marshall noticed that the amount of money payable to defendant and GS Consulting was substantially less than what APA had routinely paid during the previous months.[11] Although Marshall testified he signed checks for these prior payments because he had trusted defendant and assumed that the work had been done, none of these overpayments was authorized by APA. Defendant, however, argues that the apparent overpayments were contemplated by the parties' various agreements and were for work performed by GS Consulting.

### C. Pattern of Unlawful Activity

The jury found that the three episodes of communications fraud were interrelated and had the same purpose, result, participants, victims, and methods of commission. The jury also found that the twelve episodes of theft were likewise interrelated. Thus, defendant was also convicted of engaging in a "pattern of unlawful activity."[12]

### ISSUES

Defendant presents several issues on appeal, which boil down to these: (1) whether

---

9. Art Marshall alleged that defendant double-charged APA in the following amounts: August, $400; September, $350; October, $300; November, $250; December, $125; January, $150; February, $75; March, $125; April, $175; May, $100; June, $325; and July, $150. The 1991 and 1992 total of "double-charged" income was $2,525.

10. According to Marshall, defendant made "padded" payments in the following amounts: August, $87.50; September, $800; October, $925; November, $900; December, $962.50; January, $1,125; February, $1,150; March, $1,350; April, $1,287.50; May, $1,375; June, $1,300; and July, $1,125. The 1991 and 1992 total of these payments was $12,387.50.

11. Marshall's discovery of defendant's questionable accounting practices prompted APA to hire

an outside accounting firm to conduct an audit. Information from the audit was ultimately provided to police investigators.

12. Utah Code Ann. § 76–10–1602(2) (Supp.1997) provides, in relevant part:

"Pattern of unlawful activity" means engaging in conduct which constitutes the commission of at least three episodes of unlawful activity, which episodes are not isolated, but have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics. Taken together, the episodes shall demonstrate continuing unlawful conduct and be related either to each other or the enterprise.

the trial court erred in admitting the IRS agent's testimony regarding the legality of assigning income and by not instructing the jury as to the criminal intent required to sustain a conviction for communications fraud and (2) whether there was sufficient evidence upon which to convict defendant of theft and engaging in a "pattern of unlawful activity."[13]

## ANALYSIS

### A. Communications Fraud

We hold that the trial court clearly erred in admitting the IRS agent's testimony regarding the lawfulness of assigning income. We also hold that the trial court erred in not instructing the jury as to the criminal intent element of communications fraud.[14]

#### 1. The IRS Agent's Testimony

■ "The trial court has wide discretion in determining the admissibility of expert testimony, and such decisions are reviewed under an abuse of discretion standard. Under this standard, we will not reverse unless the decision exceeds the limits of reasonability." *State v. Larsen*, 865 P.2d 1355, 1361 (Utah 1993) (citations omitted). *See Davidson v. Prince*, 813 P.2d 1225, 1230 (Utah Ct.App.), *cert. denied*, 826 P.2d 651 (Utah 1991).

At trial, the prosecutor called the IRS agent and asked him a hypothetical question consisting of the exact actions of which defendant was accused. The prosecutor then asked the agent to give an opinion as to whether these actions were *illegal*.[15]

■ Rule 704 of the Utah Rules of Evidence allows expert testimony regarding ultimate issues.[16] However, this rule does not allow all opinions by experts.

"The Advisory Committee notes [to Rule 704] make it clear that questions which would merely allow the witness to tell the jury what result to reach are not permitted. Nor is the rule intended to allow a witness to give legal conclusions."

*Davidson*, 813 P.2d at 1231 (alteration in original) (quoting *Owen v. Kerr–McGee Corp.*, 698 F.2d 236, 240 (5th Cir.1983)). *Accord State v. Tenney*, 913 P.2d 750, 756 (Utah Ct.App.), *cert. denied*, 923 P.2d 693 (Utah 1996). A legal conclusion like that offered by the IRS agent is not within the province of an expert witness.

Moreover, the IRS agent's legal conclusion was wrong. Many situations exist in which assignment of one's income to another is *not* illegal. Assignment for the benefit of a creditor is an example which comes readily to mind. The IRS agent was apparently referring to the illegality—for federal income tax purposes—of assigning income to conceal it and thereby avoid paying taxes on it. The agent's statement may have been generally correct in the tax context, but it was not clearly so limited nor was tax evasion in issue. Thus, the testimony could easily have

---

13. Although defendant also argues insufficiency of the evidence for his communications fraud conviction, because we hold that the trial court erred with respect to the communications fraud conviction by admitting the testimony of the IRS agent and not instructing the jury on the mens rea requirement for communications fraud, we need address the sufficiency issue only with regard to theft and engaging in a pattern of unlawful activity.

14. In view of our invalidation of the communications fraud conviction on evidentiary grounds, our reaching the intent-instruction issue may seem unnecessary. However, we address the issue not only because the $912.75 unreported payment made directly to defendant is unaffected by the agent's testimony, but also because the question is likely to arise on remand. *See State v. James*, 819 P.2d 781, 795 (Utah 1991); *State v. Bell*, 770 P.2d 100, 108 (Utah 1988).

15. The challenged exchange is as follows:

Q I'm going to pose a hypothetical. If an individual—we'll call him Mr. A[—]performs personal services, such as accounting work, tax preparation, payroll preparation, filing of quarterly tax returns, preparation of tax documents for employers, a compilation of payroll records, and clinical work[ ] such as counseling, group therapy[,] individual counseling, is it lawful for that individual to assign income from those activities to a third party[?]

A No, that is not lawful.

16. The pertinent part of Rule 704 provides: "[T]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Utah R.Evid. 704(a).

misled the jury. Accordingly, we hold that the trial court erred in admitting the IRS agent's testimony.

### 2. The Jury Instructions and Intent

■ We review jury instructions under a correctness standard, granting no particular deference to the trial court. *See Ong Int'l (U.S.A.) Inc. v. 11th Ave. Corp.*, 850 P.2d 447, 452 (Utah 1993); *State v. Gibson*, 908 P.2d 352, 354 (Utah Ct.App.1995), *cert. denied*, 917 P.2d 556 (Utah 1996). Also, "[w]e review jury instructions in their entirety to determine whether the instructions, taken as a whole, fairly instruct the jury on the applicable law." *Laws v. Blanding City*, 893 P.2d 1083, 1084 (Utah Ct.App.), *cert. denied*, 910 P.2d 425 (Utah 1995). "However, jury instructions to which a party failed to object at trial will not be reviewed absent a showing of manifest injustice." *Gibson*, 908 P.2d at 354; *State v. Perdue*, 813 P.2d 1201, 1203 (Utah Ct.App.1991), *aff'd*, 900 P.2d 1093 (Utah 1995). "Failure to give an elements instruction for a crime satisfies the manifest injustice standard under [Utah Rule of Criminal Procedure] 19(c) and constitutes reversible error as a matter of law." *Id.* "Further, because ' "[t]he general rule is that an accurate instruction upon the basic elements of an offense is essential," ' failure to provide such an instruction is reversible error that can never be considered harmless." *State v. Souza*, 846 P.2d 1313, 1320 (Utah Ct.App.1993) (alteration in original) (citations omitted).

In order to convict defendant of communications fraud, the State was required to prove every element of section 76–10–1801, including the mens rea requirement embodied in subsection (7) of the statute.[17] *See generally State v. Tebbs*, 786 P.2d 775, 778 (Utah Ct.App.1990). In this case, however, the trial court failed to adequately instruct the jury on the mens rea element of communications fraud.

Instruction number ten, which was the communications-fraud elements instruction, provides, in pertinent part:

> The essential elements of the crime of Communication[s] Fraud ... are as follows:
>
> 1. That the defendant ...
>
> . . .
>
> 4. Having devised a scheme or artifice to defra[u]d another or to obtain from another [ ]money, pro[pe]rty, or anything of value,
>
> 5. By means of false or fraudulent pretense, representations, promises or material omissions,
>
> 6. Did communicate directly or indirectly with another by any means for the purpose of executing or concealing the scheme or artifice. . . .

The State claims that instruction number ten essentially mirrors the statutory language defining the offense. However, the State is only partially correct. While instruction number ten does mirror the first subsection of section 76–10–1801, it fails to include any mention of subsection (7) of this statute, which sets forth the mens rea element.[18]

The State further argues instruction number ten is sufficient in the context of other

---

**17.** Utah Code Ann. § 76–10–1801 (Supp.1997) provides, in relevant part:

> (1) Any person who has devised any scheme or artifice to defraud another or to obtain from another money, property, or anything of value by means of false or fraudulent pretenses, representations, promises, or material omissions, and who communicates directly or indirectly with any person by any means for the purpose of executing or concealing the scheme or artifice is guilty of [communications fraud.]
>
> . . . .
>
> (4) An intent on the part of the perpetrator of any offense described in Subsection (1) to permanently deprive any person of property, money, or thing of value is not a necessary element of the offense.

> . . . .
>
> (7) A person may not be convicted under this section unless the pretenses, representations, promises, or material omissions made or omitted were made or omitted intentionally, knowingly, or with a reckless disregard for the truth.

**18.** Subsection (7) was apparently amended to address the concerns raised by this court in *State v. Tebbs*, 786 P.2d 775, 778 (Utah Ct.App.1990). As amended, subsection (7) squarely places the burden on the State to prove the mens rea element—that defendant acted "intentionally, knowingly, or with a reckless disregard for the truth." Utah Code Ann. § 76–10–1801(7) (Supp.1997).

jury instructions [19] because its language, that defendant "devised a scheme or artifice to defraud" and communicated false information "for the purpose of executing . . . the scheme or artifice," satisfies the mens rea requirement that defendant communicate false information intentionally or knowingly, or with a reckless disregard for the truth. We disagree. It is too long a reach to suggest the jury divined that defendant had to act intentionally because such a level of volition is inherent in the concept of "devis[ing] a scheme." Nor may the *purpose* for which an act is done be so readily equated with the actor's mental state in performing the act. Instruction number ten, which failed to include any mention of the mens rea element of section 76–10–1801(7), is wholly insufficient as a mens rea instruction even if read in light of all other instructions. Thus, instruction number twenty-two's definition of "knowing" and "intentional" would confuse rather than enlighten the jury, since it concerns terms used nowhere else in the instructions. The conclusion is inescapable that the jury instructions, taken as a whole, did not fairly instruct the jury on the mens rea requirement for communications fraud.

Because we conclude the trial court erred in admitting the IRS agent's testimony and in failing to instruct the jury on the mens rea element, we reverse and remand for a new trial on the communications fraud charges.

## B. Sufficiency of the Evidence

 Defendant next argues that the evidence is insufficient to support his convictions for theft and engaging in a pattern of unlawful activity.

> When a jury verdict is challenged on the ground that the evidence is insufficient, . . . "[this court] review[s] the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury. [This court will] reverse a jury conviction for insufficient evidence only when the evidence, so viewed, is sufficiently inconclusive or in-

herently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted."

*State v. Hamilton,* 827 P.2d 232, 236 (Utah 1992) (citations omitted).

### 1. Theft

 Utah Code Ann. § 76–6–404 (1995) defines theft as follows: "A person commits theft if he obtains or exercises unauthorized control over the property of another with a purpose to deprive him thereof." Additionally, section 76–6–402 sets forth presumptions and defenses to theft and provides, in relevant part:

> (3) It is a defense under this part that the actor:
>
> (a) Acted under an honest claim of right to the property or service involved; or
>
> (b) Acted in the honest belief that he had the right to obtain or exercise control over the property or service as he did; or
>
> (c) Obtained or exercised control over the property or service honestly believing that the owner, if present, would have consented.

Utah Code Ann. § 76–6–402 (1995). " 'If at the time of the taking of the property by the defendant he in good faith believed said property was his or if [the jury] had reasonable doubt to that effect, they should acquit him.' " *State v. Cude,* 14 Utah 2d 287, 383 P.2d 399, 401 (1963) (citation omitted).

Defendant asserts that much of the evidence presented supports the proposition that, whether or not he acted properly in absolute terms, he honestly believed he was paying himself, GS Consulting, and his wife the correct amount due under their numerous and ever-changing agreements with APA. Defendant emphasizes that "there was mass confusion on the part of everyone as to the amount of money that APA was to pay [him and his wife]." However, defendant has not demonstrated that, "even view-

---

**19.** Instruction 22 defined "knowing" and "intentional" conduct. Instruction 23 explained that "in every crime . . . there must exist a union or joint operation of act and intent." Instruction 26 stated, "Unless otherwise provided, ignorance or mistake of fact which disproves the culpable mental state is a defense to any prosecution for that crime."

ing the evidence in the light most favorable to the court below, that evidence is insufficient to support the court's finding." *State v. Robertson*, 932 P.2d 1219, 1223–24 (Utah 1997).

While there was admittedly evidence the other way, evidence was presented at trial that sufficiently supports the jury's conclusion that defendant perpetrated a theft rather than that he made an honest mistake. Immediately after defendant took control of payroll, he manifested an intent to steal by assigning counseling hours he had worked to his wife, charging APA her $25 hourly rate, while at the same time receiving his salary. At this time he also caused APA to make additional payments to GS Consulting. These "double-charges" and "overpayments" were both made in contravention of the August 1991 agreement.

In reviewing the evidence in the light most favorable to the jury's verdict, we have to assume that a written agreement did exist. Both Art Marshall, the APA administrator, and Marie Jackson, the administrative assistant who typed the memorandum of the agreement, testified as to its terms. The jury apparently concluded that their testimony was more credible than defendant's wife's testimony. We will not disturb the jury's credibility determinations.

> When the evidence presented is conflicting or disputed, the jury serves as the exclusive judge of both the credibility of witnesses and the weight to be given particular evidence. Ordinarily, a reviewing court may not reassess credibility or reweigh the evidence, but must resolve conflicts in the evidence in favor of the jury verdict.

*State v. Workman*, 852 P.2d 981, 984 (Utah 1993) (citations omitted). Only in "some unusual circumstances" may a reviewing court reassess witness credibility, such as when there is "either a physical impossibility of the evidence being true, or its falsity [is] apparent without any resort to inferences or deductions." *Id.*

Payments for the assigned hours while defendant was in control of payroll totaled $2,525. According to the agreement with APA, as the jury apparently found it to be, defendant's salary of $400 was to cover any counseling he provided. APA never agreed to pay defendant by the hour for counseling services he provided, not to mention the transfer of these hours to his wife for payroll purposes. Even defendant's wife conceded that defendant had APA pay GS Consulting for hours of clinical counseling defendant performed. Payroll ledgers, admitted into evidence, show defendant's name crossed out as the therapist and his wife's name written in. The parties stipulated that these changes were in defendant's handwriting. Thus, defendant was paid twice for his services: once by his regular salary and again by attributing his work to his wife and billing APA at her hourly rate. Such double-payment was not authorized by defendant's agreement with APA, and the jury was free to reject the suggestion that defendant honestly thought it was authorized.

APA personnel testified that defendant also "padded" payments totaling $12,387.50 for the twelve months that defendant was in control of payroll. While defendant's wife testified that these amounts were discrepancies in the payments for her hours, draws on future revenue, or distribution of profits, the jury apparently found that the testimony of defendant's wife was not credible. We will not disturb such a determination, especially since no "unusual circumstances" exist here. *Id.*

The jury had before it ample evidence that contradicted defendant's wife's explanations for the overpayments. Defendant himself was in charge of bookkeeping and payroll during this period. Also, all draws on future revenues ceased as of August 1991; thus, this was not a reasonable explanation for the "padded payments" made following August 1991. Defendant's wife was alone in testifying that draws on future revenues continued through this period. Finally, distribution of profits cannot fully explain the unaccountable amounts because defendant's final accounting to APA, dated September 1, 1992, claims that a percentage of profits due to GS Consulting from January 1, 1991, until August 31, 1992, had not yet been paid.

Based on this evidence, a jury could reasonably infer that defendant possessed the intent to steal and did not operate under an honest claim of right. Defendant has failed

to carry his burden of demonstrating that, viewed in the light most favorable to the jury's verdict, the evidence and reasonable inferences drawn from it are so inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that he had the intent to steal. *See Hamilton,* 827 P.2d at 236. In essence, the jury chose to believe the testimony of the other witnesses over that of defendant's wife.[20]

### 2. Pattern of Unlawful Activity

■ Finally, although we reverse and remand on the communications fraud conviction, we hold that the State provided sufficient evidence to convict defendant of engaging in a "pattern of unlawful activity" with respect to the twelve counts of theft. *See* Utah Code Ann. § 76–10–1602(2) (Supp. 1997); *supra* note 12 (quoting section 76–10–1602(2)). The twelve counts of theft readily satisfy the elements of "pattern of unlawful activity," namely, that at least three episodes of unlawful activity were interrelated and had the same purpose, result, participants, victims, or methods of commission. *See id.* All of the twelve "episodes" of theft involved defendant and APA and occurred as a result of defendant taking advantage of his payroll responsibilities.

### CONCLUSION

We affirm defendant's convictions for theft and engaging in a pattern of unlawful activity. However, because the trial court committed reversible error by admitting the testimony of the IRS agent and by failing to adequately instruct the jury on the mens rea requirement for communications fraud, we reverse the communications fraud convictions and remand for a new trial on the communications fraud counts.

DAVIS, P.J., and WILKINS, Associate P.J., concur.

---

**20.** Defendant also asserts that the documentation supporting the payments made to defendant as offered by Art Marshall did not match the payments actually received by defendant, as shown by copies of the checks themselves. However, the State showed, apparently to the jury's satisfaction, that this discrepancy was largely attributable to deductions, such as tax withholding.