**2014 UT App 255**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Plaintiff and Appellee,
*v.*
JOSHUA PAUL CHAPMAN,
Defendant and Appellant.

Opinion
No. 20120137-CA
Filed October 23, 2014

Third District Court, Salt Lake Department
The Honorable Dennis M. Fuchs
No. 081906646

Lori J. Seppi and Scott A. Wilson, Attorneys
for Appellant

Sean D. Reyes and Deborah L. Bulkeley, Attorneys
for Appellee

SENIOR JUDGE PAMELA T. GREENWOOD authored this Opinion, in which JUDGE STEPHEN L. ROTH concurred, with opinion. JUDGE JOHN A. PEARCE concurred in part and concurred in the result, with opinion.[1]

GREENWOOD, Senior Judge:

¶1    Defendant Joshua Paul Chapman appeals his conviction for securities fraud, a second degree felony. We affirm.

---

1. The Honorable Pamela T. Greenwood, Senior Judge, sat by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(6).

BACKGROUND

¶2    In 2005, Sterling Madsen, who had known Chapman and his family for many years, invested $30,000 in a "hard money loan"[2] for which Chapman acted as an intermediary.[3] In accordance with the terms of the loan, Chapman promptly returned the $30,000 back to Madsen with interest. In October 2006, Chapman contacted Madsen with another hard money investment opportunity involving a third party, Dennis Rowley. Rowley sought a $70,000 hard money loan to finance improvements to a house that would "almost double" its appraisal value. Rowley agreed to repay the loan in fifty-one days at 100% interest and would obtain the funds to do so by taking out a home equity loan against the property upon completion of the renovation project.

¶3    Madsen wanted to think the proposal over for a week and expressed concern to Chapman as to whether Rowley "could pull this off" because the interest rate was "astronomical" and the terms of the proposed written agreement indicated that the note was not secured. Chapman reassured Madsen that he believed Rowley was capable, which Madsen interpreted as an indication that Chapman "had checked [Rowley] out well enough that [Chapman] had confidence in him" and that this deal would go smoothly "just like

---

2. Hard money loans are most commonly used in connection with real estate transactions and offer an alternative to conventional loans "[w]hen financing is difficult to obtain." *Mortgages: Hard Money*, 40-Mar. Real Est. L. Rep. 6, 6 (2011). Hard money loans "carry much higher interest rates than conventional loans" and are generally secured by the property in which the loan is invested. *Id.* The lenders involved "are not commercial banks or other traditional lenders; instead they often are private investors familiar with their local economy." *Id.* An individual involved in flipping houses may seek out "hard money loans for short-term financing, with the first proceeds of a sale used to pay off the loan." *Id.* at 7.

3. We recite the facts in a light most favorable to the jury's verdict. *State v. Kruger*, 2000 UT 60, ¶ 2, 6 P.3d 1116.

the last client" with the $30,000 loan. Madsen also recalled Chapman describing having "some kind of . . . a document that would allow [them] to go and get that property if Mr. Rowley couldn't perform." Chapman did not show Madsen any such document but assured him that Rowley's house had "'plenty of equity in it'" and that they could "'easily get [Madsen's] principal and interest back'" if it came to that.

¶4     Madsen ultimately agreed to the deal because of the trust he had developed in Chapman "over years of knowing him and his family and of . . . having at least one prior business deal with him." At no point in the discussions leading up to the agreement did Chapman inform Madsen that he was expecting a $70,000 commission from the transaction, meaning that Rowley agreed to pay 200% interest on the loan, for a total obligation of $210,000.

¶5     Two weeks later, Madsen entered into another hard money loan with Chapman as the intermediary and Rowley as the borrower. This time, Madsen agreed to lend Rowley $140,000 at 4% monthly interest, which Rowley intended to use on a completely different project. Madsen borrowed the funds needed for this second transaction through a home equity loan on a rental property he owned.[4]

¶6     The $70,000 note became due on December 15. Madsen, having received no payments, contacted Chapman a week later. Chapman explained that Rowley had apparently encountered "some kind of water damage in this house that he was buying, and that now he was going to go sue the seller" and that he would be unable to pay the $70,000 note back until "he wrapped that up." Madsen followed up some time later, and Chapman informed him that things were still "'kind of up in the air'" and that he did not know when Rowley would have Madsen's money.

---

4. Chapman was acquitted of a second count of securities fraud based on the $140,000 loan.

¶7     During this conversation, Madsen inquired about utilizing the document that Chapman had described in conjunction with the $70,000 loan that purportedly allowed them to "go get [Rowley's] house if anything went wrong and Mr. Rowley couldn't finish this project himself." Chapman admitted that he did not have "that document" and later testified that the document was for a lease option and provided no security for the note. Madsen also reminded Chapman that Chapman had promised to pay Madsen back himself if anything went wrong with the deal. Chapman denied personally guaranteeing the loan, but Madsen recalled Chapman indicating only that he could not afford to pay him back his investment. Madsen later discovered that the property was for sale. By then, Rowley had "disappeared." Chapman told Madsen that the last he knew of Rowley was that "he was living out of his car" and that "he just emailed [Chapman] now occasionally." Chapman then supplied Madsen with a copy of a promissory note between Chapman and Rowley signed on the same date the $70,000 note was executed, in which Madsen learned that Chapman expected to receive a $70,000 commission on the deal.

¶8     The State charged Chapman with two counts of securities fraud based on his role as intermediary for the two hard money loans between Madsen and Rowley.[5] Before trial, the State indicated its intent to call Michael Hines, the then-Director of Enforcement at the Utah Division of Securities, as an expert witness at trial. Chapman unsuccessfully moved to exclude all legal conclusions, legal definitions, and opinions on ultimate issues from Hines's testimony. A jury trial was held in October 2011. At the close of the State's evidence, and several other times, Chapman moved for a directed verdict. At the close of all of the evidence, he renewed his directed verdict motion on the basis that the State did not present sufficient evidence to establish willfulness, a necessary element of both of the charges against him. The trial court denied the motions, ruling that willfulness was "an issue for the trier of fact." The jury convicted Chapman of one count of securities fraud

---

5. Rowley was a co-defendant in this case and pleaded guilty.

related to the $70,000 loan and acquitted him of the second count of securities fraud based on the $140,000 loan. Chapman appeals.

ISSUES AND STANDARDS OF REVIEW

¶9 Chapman raises two issues on appeal. First, he argues that the trial court erred by denying his motions for directed verdict because the State did not introduce sufficient evidence to prove the willfulness element of securities fraud. We reverse "a trial court's denial of a motion for directed verdict . . . on the basis of insufficiency of the evidence . . . only if, viewing the evidence in the light most favorable to the prevailing party, we conclude that the evidence is insufficient to support the verdict." *Brewer v. Denver & Rio Grande W. R.R.*, 2001 UT 77, ¶ 33, 31 P.3d 557 (citation and internal quotation marks omitted); *accord State v. Harrison*, 2012 UT App 261, ¶ 10, 286 P.3d 1272.

¶10 Second, Chapman argues that the trial court exceeded its discretion by allowing the State to elicit legal conclusions on ultimate issues from its expert witness. "It is within the discretion of the trial court to determine the suitability of expert testimony in a particular case, and we will not reverse that determination on appeal in the absence of a clear showing of abuse." *State v. Johnson*, 2009 UT App 382, ¶ 17, 224 P.3d 720 (citation and internal quotation marks omitted).

ANALYSIS

I. Directed Verdict

¶11 Chapman argues that the trial court erred by denying his motions for directed verdict because the State failed to provide sufficient evidence that he acted willfully. The Utah Uniform Securities Act states,

>It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly to:
>(1) employ any device, scheme, or artifice to defraud;
>(2) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
>(3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

Utah Code Ann. § 61-1-1 (LexisNexis 2011). In addition, the Act provides, "[A] person who willfully violates Section 61-1-1 . . . is guilty of a second degree felony if, at the time the crime was committed, the property, money, or thing unlawfully obtained or sought to be obtained was worth $10,000 or more." *Id.* § 61-1-21(2)(b). In this context, to act willfully "means to act deliberately and purposefully, as distinguished from merely accidentally or inadvertently," and "when applied to the intent with which an act is done or omitted, [willful] implies a willingness to commit the act" but "does not require an intent to violate the law or to injure another or acquire any advantage." *State v. Larsen*, 865 P.2d 1355, 1358 n.3 (Utah 1993) (interpreting the willfulness requirement in section 61-1-21 of the securities fraud statute). The jury was instructed that it could find that Chapman had acted willfully, i.e., made a willful misstatement or omission of a material fact, if it determined that Chapman "consciously avoided the existence of a fact or facts" but that he could not "be convicted if he was merely negligent, careless or foolish"; "[h]e must have acted with a conscious objective or desire to ignore a material fact or facts." The jury instructions defined "material fact" as "something which a buyer of ordinary intelligence and prudence would think to be of importance in determining whether to buy or sell a security." The jury was also instructed that

for an omission to be "material" it must be a matter which:

(a) a reasonable person would attach importance to its existence or nonexistence in determining his or her choice of action in the transaction in question; or
(b) the person making the omission knows or has reason to know that the person regards or is likely to regard the matter as important in determining his or her choice of action, although a reasonable person would not so regard it.

¶12    As Chapman points out, there is evidence in the record suggesting that inexperience and bad luck are to blame for Madsen's losses, rather than willfulness on Chapman's part. This includes evidence of Chapman's young age at the time of the loans (mid-twenties), his limited education, and his few years of experience in the real estate market, which occurred entirely during a "boom" in the local housing market. Likewise, Chapman's testimony of his and Madsen's pre-existing friendship and their families' connections could negate a finding of willfulness on his part.

¶13    However, there is also evidence in the record supporting the State's contentions. The State argued that Chapman made several willful misstatements or omissions of material fact and contends that any one of those statements can support Chapman's conviction. The State asserts that Chapman's conviction could rest on his having vouched for Rowley's ability to repay the $70,000 loan at 100% interest without disclosing the fact that his opinion was not informed by any actual research into Rowley's financial background. Likewise, the State contends that Chapman's failure to disclose the $70,000 commission he was expecting from that loan amounted to a misrepresentation of the terms of the loan to Madsen; Chapman told Madsen that Rowley would repay the $70,000 loan with 100% interest for a total of $140,000, when Rowley had actually agreed to repay the loan with 200% interest for a total of $210,000. Given Madsen's skepticism of Rowley's ability to pull off the deal at 100% interest, the jury could reasonably determine that either of these actions by Chapman

constituted a willful material misstatement or omission of a material fact. *See generally infra* ¶ 21.

¶14    The State also argues that Chapman falsely represented the existence of collateral for the $70,000 loan. Chapman testified that he was aware that the document Madsen believed created a security interest in Rowley's property was actually an assignment of contract rights and did not create a security interest but that he nonetheless informed Madsen that he "had a document to hopefully back up [the] deal." Chapman testified that he clearly communicated the risks associated with the $70,000 loan, including that the loan was not secured and that this lack of collateral was why he was able to negotiate such a high interest rate. And Madsen testified that he had read the terms of the promissory note describing the note as unsecured and then indicated that this was a "sticking point" for him. Nonetheless, there is sufficient evidence in the record for the jury to determine that Chapman misstated a material fact by representing the document as more than it was in order to assuage Madsen's concerns about the risk of the investment. Accordingly, the trial court did not err in denying Chapman's motions for directed verdict based on insufficient evidence of willfulness.

## II. Expert Testimony

¶15    Next, Chapman argues that his conviction should be reversed because the trial court erroneously permitted the State to elicit legal conclusions on ultimate issues from its expert witness, Michael Hines.[6]

¶16    "The trial court has wide discretion in determining the admissibility of expert testimony, and such decisions are reviewed under an abuse of discretion standard. Under this standard, we will not reverse unless the decision exceeds the limits of reasonability." *State v. Stringham*, 957 P.2d 602, 607 (Utah Ct. App. 1998) (citation

---

6. Chapman did not object to Hines's qualifications to testify as an expert witness. Consequently, there is no issue of qualification in this case.

and internal quotation marks omitted). Appropriate expert testimony will "help the trier of fact to understand the evidence or to determine a fact in issue." Utah R. Evid. 702(a). In securities cases in particular, "expert testimony may be appropriate . . . because the technical nature of securities is not within the knowledge of the average layman or a subject within the common experience and would help the jury understand the issues before them." *State v. Larsen*, 865 P.2d 1355, 1361 (Utah 1993) (citation and internal quotation marks omitted).

¶17 An expert witness may testify in the form of an opinion and can opine on an ultimate issue at trial "as long as that testimony is otherwise admissible under the rules of evidence." *Id.* at 1363 (construing rule 704 of the Utah Rules of Evidence); *see also* Utah R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue."). An expert witness exceeds the scope of permissible testimony when "the witness's legal conclusions blur the separate and distinct responsibilities of the judge, jury and witness, or there is danger that a juror may turn to the [witness's legal conclusion] rather than the judge for guidance on the applicable law." *State v. Johnson*, 2009 UT App 382, ¶ 37 n.14, 224 P.3d 720 (alteration in original) (citation and internal quotation marks omitted). "No 'bright line' separates permissible ultimate issue testimony under rule 704 and impermissible 'overbroad legal responses' a witness may give during questioning," *State v. Davis*, 2007 UT App 13, ¶ 16, 155 P.3d 909 (citation omitted), and a "trial court has wide discretion in determining the admissibility of expert testimony," *Larsen*, 865 P.2d at 1361.

¶18 Chapman raises three specific challenges to Hines's testimony. He claims that Hines impermissibly testified as to the meaning of the terms "security," "material fact or omission," and "predicate statement," which had the effect of telling "the jury what result to reach." We address each challenge in turn.

A.     The Meaning of "Security"

¶19 First, Chapman contends that for the jury to convict him on the first count of securities fraud, it needed to decide whether the

unsecured promissory note for the $70,000 loan constituted a security. Chapman argues that Hines "told the jury that the transaction at issue would constitute a security" by testifying that promissory notes and "notes that are issued for investment purposes and are not collateralized" are securities.[7]

¶20    Hines testified that there are "two different forms" of securities—those that are explicitly enumerated in the Utah Code as a security, *see* Utah Code Ann. § 61-1-13(1)(ee) (LexisNexis 2011), and those "that need an explanation in which elements are met to define the transaction as a security." In response to the State's question as to whether promissory notes, in general, can be securities, Hines explained that "notes that are issued for investment purposes and are not collateralized are" recognized in the industry as securities while "[n]otes that are issued in which there is collateral attached . . . [are] less likely a security." Hines explained in broad terms how those in the industry may characterize a transaction that is not clearly enumerated in the Securities Act as a security. Hines did not tell the jury that the transaction at issue was a security, couch his opinion specifically in terms of what is required under Utah law, or otherwise tell the jury what conclusion to reach. *Compare, e.g., Larsen*, 865 P.2d at 1361 & n.10 (holding that an expert witness's testimony on an ultimate issue was admissible, recognizing that the expert did not specifically testify that the defendant was guilty or "that, as a matter of law, the facts satisfied the [applicable] legal standard"), *with Davis*, 2007 UT App 13, ¶ 17 (determining that a witness's testimony should have been excluded where the witness connected his opinion testimony "to the requirements of Utah law" and

---

7. Chapman also argues that Hines's testimony explaining that "a transaction is 'more likely a security' if 'the people involved use the term investment'" was improper because "[d]uring trial, the witnesses repeatedly called the loan an investment." This argument is without merit, particularly in light of the fact that the only individuals that used the term "investment" to refer to the $70,000 loan during trial were Chapman, defense counsel, and the prosecutor.

answered "a specific question" on the verdict form (citations and internal quotation marks omitted)), *and Stringham*, 957 P.2d at 607 (holding that the trial court erred in permitting the prosecutor to pose a hypothetical scenario to an expert witness "consisting of the exact actions of which [the] defendant was accused" in order to ask the expert "to give an opinion as to whether the[] actions were illegal" (emphasis omitted)). Accordingly, the trial court did not abuse its discretion in permitting Hines to testify as to the meaning of "security."

B.      Meaning of "Material Information"[8]

---

8. Judge Pearce's concurring opinion concludes that the trial court abused its discretion in admitting Hines's testimony regarding materiality because that testimony was within the knowledge and experience of an average layperson and therefore unhelpful. *See generally* Utah R. Evid. 702(a) (requiring an expert's testimony to "help the trier of fact to understand the evidence or to determine a fact in issue"). While we agree that the trial court failed to address "whether the testimony would actually be helpful to the jury," *see infra* ¶ 28, the reason for the omission is obvious: counsel never raised those specific questions. Chapman has maintained a fairly narrow position throughout the proceedings, requesting only that Hines be prohibited from offering legal conclusions in his testimony, specifically, that he be prohibited from testifying as to whether the individual promissory notes at issue in this case amounted to securities and whether the specific acts or omissions alleged in this case were material. Chapman has explicitly stated that he was not seeking to exclude Hines from testifying, that Hines should be permitted to testify as to "what the test is to determine whether a promissory note is considered a security," and that Hines could "also provide the definition of materiality." Although Chapman also argued at times that Hines should not be permitted to define "materiality," he based this assertion on the lack of a statutory definition of the term and made only a passing reference to helpfulness. Accordingly, we do not consider the issues addressed in Judge Pearce's concurring opinion to be properly before this court for our disposition. *See State v. White*, 2011 UT 21,

(continued...)

¶21 For the jury to convict Chapman on the first count of securities fraud, it also needed to decide whether Chapman misstated or omitted a material fact in relation to the $70,000 loan. Chapman contends that Hines impermissibly "tied his examples" of what constitutes "material information to the State's allegations."[9] Chapman claims that Hines testified that a seller is "required" to disclose

> (1) the "risks associated with an investment"; (2) any "compensation or commission"; (3) "your ability to get your money back"; (4) "all financial information concerning the issu[er]," including whether "the principals . . . have civil histories, bankruptcies, criminal histories"; (5) whether "the individuals who

---

8. (...continued)
¶ 34, 251 P.3d 820 (noting that Utah appellate courts will generally refrain from addressing an argument outside the scope of the issues presented); *cf. State v. Robison*, 2006 UT 65, ¶¶ 16, 22, 147 P.3d 448 (explaining that because an unargued and unbriefed legal theory "was never subjected to the rigors of the adversarial process," appellate courts "should not normally search the record for unargued and unbriefed reasons to reverse a [district] court judgment" (alteration in original) (citation and internal quotation marks omitted)).

9. Chapman also asserts that Hines "incorrectly asserted that the securities fraud statute imposed an affirmative duty to investigate and disclose certain material information." The record contains no such statement by Hines; indeed, Hines testified to the opposite: "[Individuals selling securities] have to make sure that any statement they make is truthful, and that they do not omit any material fact if they make a predicate statement. *An omission by itself is not actionable. The fact that there is some fact available is not actionable*." (Emphasis added.) We therefore do not reach this issue. *Cf. State v. Wallace*, 2005 UT App 434, ¶¶ 14–15, 124 P.3d 259 (declining to address whether the willfulness element in securities fraud cases imposes on the seller an affirmative duty to investigate), *aff'd*, 2006 UT 86, 150 P.3d 540.

> are offering and selling the securities are [] licensed"; and (6) "the financial condition of the issuer."

(Alterations and omission in original.) Chapman has taken these statements out of context. Hines did not list these items as required disclosures but as "some examples" of the information that he believed is important "[f]or a purchaser of a security to make an intelligent investment decision." While these observations by Hines "express an opinion regarding the ultimate resolution of [a] disputed issue," the testimony does not cross the line drawn by rule 704 of the Utah Rules of Evidence. *See State v. Larsen*, 865 P.2d 1355, 1363 (Utah 1993). Hines's testimony was relevant in "help[ing] the trier of fact to understand the evidence or to determine a fact in issue," *see* Utah R. Evid. 702(a), by explaining what concerns may drive an investor's decision to purchase a security. *Compare Larsen*, 865 P.2d at 1361 (determining that an expert's opinion testimony "that some of the material that [the defendant] had omitted from the securities documents could have been important or significant to an investor" was admissible), *with State v. Tenney*, 913 P.2d 750, 756 (Utah Ct. App. 1996) (holding inadmissible expert testimony that included statements "that failure to disclose certain enumerated information would be a material omission *under Utah law*," "that the material actually provided to investors did not meet disclosure requirements *under the Act*," and that the agreements at issue "were securities *under Utah law*"). Accordingly, the trial court did not abuse its discretion by admitting this part of Hines's testimony.

C.     Meaning of "Predicate Statements"

¶22     Last, Chapman argues that Hines explained the concept and identified specific examples of "predicate statements" made by Chapman in his dealings with Madsen that are prohibited by the Securities Act.[10] *See State v. Schwenke*, 2009 UT App 345, ¶ 14, 222

---

10. This argument implies that the phrase "predicate statement" refers to an abstract legal concept. We have not found any support for such a presumption. Utah courts and other jurisdictions

(continued...)

P.3d 768. In particular, Chapman argues that Hines identified Chapman's statement vouching for Rowley as "a guy that can be depended upon" as a predicate statement and explained that in order to "lawfully" comply with the disclosure requirements of the Utah Uniform Securities Act, Chapman needed to follow up with further explanation, i.e., "a description of his investigation into Rowley's criminal history, courts history, databases or a disclaimer that he had not done any verification to support his opinion." (Internal quotation marks omitted.)

¶23 In context, however, Hines's testimony was far more generalized than Chapman lets on. In response to questions based on Chapman's statement vouching for Rowley, Hines stated,

> It is my opinion [if] that is said in connection with a securities transaction, in connection with the offer, sale or the purchase of a security, that is what I referred to earlier as a predicate statement, a statement that may or may not need more information to be clarified. A statement of that nature then needs to be followed up to be complete with,

---

10. (...continued)
employing the phrase in securities cases have not used it in association with any specific legal definition; rather, the term is used as shorthand to refer to a statement alleged to be false or misleading due to the accused's alleged material omission. *See, e.g., State v. Johnson*, 2009 UT App 382, ¶¶ 41–43, 224 P.3d 720; *State v. Schwenke*, 2009 UT App 345, ¶¶ 11, 14–15, 222 P.3d 768; *see also, e.g., Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 630 (4th Cir. 2008); *Fener v. Belo Corp.*, 513 F. Supp. 2d 733, 746 (N.D. Tex. 2007). In other words, the case law utilizes the term to refer to the unwieldy statutory language prohibiting a "person, in connection with the offer, sale, or purchase of any security, directly or indirectly to . . . omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." *See* Utah Code Ann. § 61-1-1(2) (LexisNexis 2011).

"This is how I know that he's dependable," or that, "This is merely my opinion, and I haven't done any verification," before the investor can understand the importance of that statement.

Hines's unremarkable opinion that "a statement [like] that" "may" require clarification does not "transgress[] into the area reserved for the jury by instructing the jury as to what legally constitutes" a predicate statement or material omission. *See Larsen*, 865 P.2d at 1361; *see also* Utah R. Evid. 704 (permitting an expert witness to express an opinion on an ultimate issue as long as that testimony is otherwise admissible under the rules of evidence). Accordingly, the trial court did not abuse its discretion by permitting that testimony.[11]

CONCLUSION

¶24 The trial court correctly denied Chapman's motions for directed verdict. The State presented sufficient evidence to prove that Chapman acted willfully in connection with the $70,000 loan. The trial court did not abuse its discretion by admitting Hines's testimony as to the meaning of "security," "materiality," and

---

11. Chapman also argues that Hines's testimony should have been excluded under rules 702 and 403 of the Utah Rules of Evidence because its probative value was outweighed by the danger of unfair prejudice and because he was in fact prejudiced by the testimony. In making this argument, Chapman simply repackages the assertions addressed above to claim that any probative value of Hines's testimony was outweighed by the prejudice resulting from the legal conclusions contained in the testimony because such legal conclusions "blur[red] the separate and distinct responsibilities of the judge, jury, and witness." *See State v. Davis*, 2007 UT App 13, ¶ 15, 155 P.3d 909 (citation and internal quotation marks omitted). We reject this argument for the same reasons we reject Chapman's other challenges to Hines's testimony. *See supra* ¶¶ 15–22.

"predicate statements" and Hines did not offer impermissible legal conclusions in his testimony. We affirm the trial court's decision.

———————

ROTH, Judge (concurring):

¶25    I concur in Judge Greenwood's opinion but write separately to note that I share Judge Pearce's concerns regarding the admissibility of the State's expert's testimony with respect to the materiality of Chapman's statements and omissions. I agree with Judge Greenwood, however, that this matter is not properly before us on appeal, and, as a consequence, I believe it would be imprudent to reach the issue. I therefore concur.

———————

PEARCE, Judge (concurring in part and concurring in the result in part):

¶26    I concur that the trial court did not err in denying Chapman's motion for a directed verdict as discussed in Part I of the majority opinion's analysis. I respectfully disagree with the conclusion that the trial court operated within the bounds of its discretion when it permitted Michael Hines, the then-Director of Enforcement at the Utah Division of Securities, to testify concerning the materiality of Chapman's statements and omissions. However, because Chapman has not shown that he was prejudiced by the trial court's admission of Hines's testimony, I concur in the result the majority opinion reaches in Part II of its analysis.

¶27    The trial court allowed Hines to testify concerning materiality, reasoning,

> I think that the Courts have made a determination that securities fraud cases and securities are very technical in nature. I think that the Courts have ruled in respect that the experts can make—can testify in regards to what securities are and what facts they would state they consider to be material or not material if omitted or provided.

Although the trial court did not provide the basis for its ruling, both parties have briefed this matter as if the court relied upon *State v. Larsen,* 865 P.2d 1355 (Utah 1993), to reach its conclusion. *See id.* at 1361 ("[E]xpert testimony may be appropriate in securities fraud cases because the technical nature of securities is not within the knowledge of the average layman or a subject of common experience and would help the jury understand the issues before them." (citation and internal quotation marks omitted)).

¶28    To the extent the trial court read *Larsen* to *require* the admission of expert testimony in every securities fraud case, it greatly expanded *Larsen*'s reach. *Larsen* held that a trial court did not abuse its discretion in permitting expert testimony concerning the materiality of information that a securities fraud defendant had omitted from documents provided to investors. However, *Larsen* specifically disavowed the suggestion that "the trial court *must* allow expert testimony regarding materiality, especially testimony utilizing the term 'material.'" *Id.* at 1363 n.12 (emphasis added). *Larsen* did not alter the requirement that to be admissible, expert testimony must be "helpful to the finder of fact" under rule 702 of the Utah Rules of Evidence. *See State v. Rimmasch*, 775 P.2d 388, 398 n.8 (Utah 1989). Nor did *Larsen* exempt expert testimony in securities fraud cases from the reach of rule 403 of the Utah Rules of Evidence. Indeed, *Larsen* noted that "an integral element of a rule 702 determination to admit expert evidence is a balancing of the probativeness of the evidence against its potential for unfair prejudice" and that the balancing of those two factors "mimics that under rule 403 and is necessary to a determination of 'helpfulness.'" 865 P.2d at 1363 n.12. Despite this instruction and Chapman's objection to Hines's testimony on those grounds, nothing in the record before this court suggests that the trial court ever considered whether the testimony would actually be helpful to the jury.[12]

---

12. The majority opinion suggests that Chapman failed to raise this argument in the trial court. Chapman conceded below that Hines could testify to "any other question that would help an average layman understand the concept of securities" but argued that
(continued...)

¶29    In other words, the trial court never examined whether Hines's testimony would help the jury "understand the evidence or to determine a fact in issue." Utah R. Evid. 702(a). Unlike many securities fraud cases, where the issues are complex, the questions presented to the jury concerning materiality in this case were straightforward. The State alleged that Chapman had made misrepresentations, including that there was equity in Rowley's property, that Chapman possessed a document that would allow him to access that equity in case of default, and that Chapman would personally guarantee repayment. The State also alleged that Chapman had failed to disclose material facts, including that he had not adequately researched Rowley's ability to pay and that Chapman stood to receive a $70,000 commission on the transaction.

¶30    Hines testified on direct examination that "an important fact is the same as a material fact." He then testified as to examples of "important facts," including: (1) "if the principals in the issuing company have civil histories, bankruptcies, criminal histories"; (2) "facts relative to your ability to get your money back"; (3) "the actual risks associated with an investment"; and (4) "what compensation or commission, if any, is paid to individuals." In addition, Hines testified that "it would be important for the investor to actually see financial statements, preferably audited financial statements" and that "if the individuals who are offering and selling the securities are not licensed, that's a fact that would be important to the investor to know."

---

12. (...continued)
Hines "should be excluded from providing an opinion as to what a reasonable purchaser in this particular situation would want to know." The State's opposition to the motion in limine specifically argued that Hines's testimony would be helpful under rule 702. The State quoted *State v. Larsen*, 865 P.2d 1355 (Utah 1993), for the proposition that "[i]n determining 'helpfulness,' the trial court must first decide whether the subject is within the knowledge or experience of the average individual." The State also argued that "[m]uch of this information is not within the knowledge of the average layman or within the common experience." The issue I address was presented to the trial court.

¶31    To determine whether Hines's testimony would aid the jury, the trial court first needed to "decide whether the subject [of the expert's testimony] is within the knowledge or experience of the average individual." *Larsen*, 865 P.2d at 1361. The definition of materiality in the context of securities fraud is whether the statement or omission is "likely to influence a reasonable investor."[13] *Id.* at 1362. The initial question for the trial court should have been whether an average individual would know that a reasonable investor would be influenced by learning: (1) that Chapman had not investigated Madsen's ability to repay the loan; (2) that contrary to his representation, Chapman did not have a document that would allow him to access the equity in Madsen's Property; (3) that Chapman did not intend to personally guarantee repayment; and (4) that Chapman would be paid a $70,000 commission on the $70,000 loan.

¶32    It is well within the experience of the average layperson to know that a reasonable investor would likely be influenced by basic information about a financial transaction, such as "facts relative [to an investor's] ability to get [his or her] money back." For example, Chapman was alleged to have misrepresented that he had "a document that would allow [them] to go and get" the borrower's property in the case of default. The jury did not need an expert's help to understand that such information would likely influence a reasonable investor.

¶33    Hines's testimony reflected that lack of complexity. Hines simply listed categories of information and told the jury that an investor would deem them to be important. Hines made no attempt to explain why such information would be important to an investor. Hines may not have explained his conclusions because

---

13. The Utah Supreme Court has also defined a "material fact" as "something which a buyer or seller of ordinary intelligence and prudence would think to be of some importance in determining whether to buy or sell." *Gohler v. Wood*, 919 P.2d 561, 567 (Utah 1996) (emphasis omitted) (citation and internal quotation marks omitted).

they needed no explanation. An average person would already know that a reasonable investor would be influenced by the kind of information the State accused Chapman of misrepresenting or omitting.

¶34 Moreover, the trial court never examined whether it would be helpful for the jury to have the sitting Director of Enforcement for the Division of Securities recite categories of information he opined investors would consider important without explanation of the information's import. On the facts of this case and the allegations leveled against Chapman, Hines's materiality testimony was not helpful.[14] *Cf. Sawant v. Ramsey*, No. 3:07-cv-980, 2012 WL 2046812, at *2 (D. Conn. June 6, 2012) (disallowing expert testimony concerning materiality of purported misrepresentations and omissions, reasoning that "[a]lthough in some instances, in the context of a much more complicated segment of the stock market, expert testimony may be admissible as helpful to suggest 'the inference which should be drawn from the specialized knowledge to the facts,' the Court finds that the facts presented by the current case are simple and straightforward" (citation omitted)). Because Hines's testimony on the question of materiality was unhelpful, the trial court exceeded its discretion in admitting that testimony.[15]

---

14. This is not to suggest that expert testimony concerning materiality can never be helpful to a finder of fact. As *Larsen* recognized, there are cases where the "technical nature of securities is not within the knowledge of the average layman or a subject within the common experience." 865 P.2d at 1361 (citation and internal quotation marks omitted). But a trial court cannot distinguish between those cases where expert testimony would assist and those where it would not if the court fails to conduct the rule 702 inquiry.

15. The trial court also failed to analyze whether Hines's testimony regarding promissory notes and predicate statements would be helpful to the jury. But Chapman has not demonstrated that these topics were within the knowledge and experience of an average

(continued...)

¶35    Chapman also argues that Hines's testimony should not have been admitted, because the danger for unfair prejudice outweighed its probative value. *See* Utah R. Evid. 403. Chapman specifically contends that Hines's testimony crossed the line into improper legal conclusions and blurred the "separate and distinct responsibilities of the judge, jury, and witness." *See State v. Davis*, 2007 UT App 13, ¶ 15, 155 P.3d 909 (citation and internal quotation marks omitted). This argument requires exploration of the boundary that separates testimony concerning the ultimate issue in the case—permitted by rule 704 of the Utah Rules of Evidence—and testimony that amounts to an improper legal conclusion—which our case law has held inadmissible. *See State v. Tenney*, 913 P.2d 750, 756 (Utah Ct. App. 1996). This court has previously noted that there is "no bright line between responses that embrace an ultimate issue and those that provide an impermissible legal conclusion." *Id.*; *accord Davis*, 2007 UT App 13, ¶ 16 ("No 'bright line' separates permissible ultimate issue testimony under rule 704 and impermissible 'overbroad legal responses' a witness may give during questioning." (citation omitted)).

¶36    In cases concerning materiality, the question turns on whether the experts "tie their opinions to the requirements of Utah law." *Tenney*, 913 P.2d at 756. In *Tenney*, we concluded that an expert's testimony crossed the line because he testified that certain information constituted "a material omission *under Utah law*" and that another expert's testimony was improper because she testified the information "was material *under the Utah Uniform Securities Act*." *Id.* Our reasoning in *Tenney* is consistent with the Utah Supreme Court's decision in *Larsen*, which permitted an expert to testify about information that "could have been important or significant to an investor" but stated that the expert "should have avoided using the specific term 'material.'" *State v. Larsen*, 865 P.2d

---

15. (...continued)
person and that, therefore, Hines's testimony should have been deemed unhelpful and inadmissible.

1355, 1362 (Utah 1993).[16] *Larsen* specifically noted that the expert did not testify that, "as a matter of law, the facts satisfied the legal standard of materiality." *Id*. at 1361 n.10.

¶37 In an apparent effort to stay on the right side of that less-than-bright line, Hines attempted to avoid directly opining that a fact was "material," preferring instead to define "material" as "important" and then testify as to what a reasonable investor would find important. Hines's testimony was not quite so cleanly on the right side of the line, however. Immediately after listing the "important information," Hines opined that the securities laws "require total disclosure of all important facts to potential purchasers." Although not as blatantly explicit as the testimony *Tenney* found improper, Hines's testimony implicitly tied his opinion to the requirements of Utah law. Hines also testified on direct examination that "the financial condition of the issuer is an important fact that needs to be disclosed," a statement that also implicitly ties its conclusion to a requirement of Utah law. These portions of Hines's testimony constituted improper legal conclusions and should not have been admitted into evidence.

¶38 In order for Chapman to obtain relief based on a showing of erroneously admitted testimony, he also must demonstrate prejudice. *State v. Johnson*, 2009 UT App 382, ¶ 37, 224 P.3d 720. This court "will not overturn a jury verdict for the admission of improper evidence if the admission of the evidence did not reasonably [a]ffect the likelihood of a different verdict." *State v. Houskeeper*, 2002 UT 118, ¶ 26, 62 P.3d 444. That Hines's materiality testimony simply recited common-sense conclusions that were within the ken of the average juror makes it difficult for Chapman to demonstrate prejudice. Because it is reasonably likely that the

---

16. The supreme court also noted that the defendant in *Larsen* had lodged his objection to the expert's use of the term "material" under rule 702 of the Utah Rules of Evidence, not rule 403. *See* 865 P.2d at 1363 n.12. The court suggested that "[i]f Larsen had made [an objection pursuant to rule 403], it might have merited serious consideration by the trial court." *Id.*

jury would have reached the same conclusion—that Chapman's statements and omissions were material to a reasonable investor—with or without Hines's improper testimony, Chapman has not established prejudice.

¶39   Moreover, we have previously held that in some circumstances a trial court can ameliorate "any potentially prejudicial effects" of an expert offering an improper legal conclusion by "correctly and promptly" instructing the jury. *Johnson*, 2009 UT App 382, ¶¶ 38–39. Chapman attempts to distinguish his case from those, like *Johnson*, where we have held that proper jury instructions and thorough cross-examination of the expert have cured any potential prejudice because the expert testimony in those cases "was not erroneous at all or so slightly erroneous." That attempt is unavailing because the expert testimony in *Johnson*—coincidentally also offered by Hines—does not differ significantly from that offered here. In *Johnson*, Hines: (1) "defined the kind of material facts that must be disclosed under section 61-1-1 of the Securities Act"; (2) testified that "officers of a corporation have a specific duty to disclose material facts about their backgrounds"; and (3) testified "to the hypothetical types of statements or omissions that would violate section 61-1-1." *Id.* ¶ 10. *Johnson* did not reach the question of whether the trial court erroneously admitted the testimony because it found any potential prejudice had been cured by jury instruction and cross-examination. The facts of this case are not so different as to warrant a different outcome.

¶40   For these reasons, I concur in the majority opinion's holding with respect to the directed verdict but concur only in the result with respect to the admission of Hines's expert testimony.

————————